In re XYAN.COM, INC., Debtor.

The Official Committee of Unsecured Creditors of Xyan.Com, Inc., et al., Plaintiff,

v.

Banta Corporation, Defendant.

Bankruptcy No. 01–14797 SR.
Adversary No. 02–707.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 22, 2003.

Patrick J. Doran, Philadelphia, PA, Alan R. Gordon, Kevin C. Rakowski, Pelino & Lentz, P.C., Philadelphia, for Plaintiff.

Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, WI, Michael L. Temin, Wolf Block Schorr and Solis–Cohen, Philadelphia, PA, for Banta Corporation.

Steven D. Usdin, Adelman, Lavine, Gold and Levin, Philadelphia, PA, for Xyan. Com, Inc.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

The Plaintiff in this adversary action is the Official Committee of Unsecured Creditors (the "Committee") of the Debtor, Xyan.Com, Inc. et al ("Xyan"). The Committee instituted the action against Defendant, Banta Corporation ("Banta") on June 11, 2002, seeking to recover damages for the alleged fraudulent transfer to Banta of substantially all of the assets of a Xyan subsidiary known as Xyan–Needham, Inc. The Committee's Complaint states a total of four counts, these being assertions of actual and constructive fraud under Bankruptcy Code § 548. 11 U.S.C. § 548(a)(1)(A) and (B), (Counts I and II), and actual and constructive fraud under the Pennsylvania Uniform Fraudulent Transfer Act. 12 Pa.C.S.A. § 5101 *et seq.* (PUFTA) (Counts III and IV) An Answer in opposition was filed on July 11, 2002 and extensive discovery ensued thereafter. Before the Court at present is Banta's Motion for Summary Judgment as to all Counts of the Complaint. Written opposition to the Motion was timely filed by the Committee and oral argument was heard on June 10, 2003. For the reasons which follow, the Motion will be denied.

### Background.

Prior to its demise Xyan was a company engaged in the digital printing and repro-

duction business. It was headquartered in King of Prussia, Pennsylvania, but had a total of eight locations across the country. Xyan and its seven subsidiaries filed individual voluntary Chapter 11 cases in this District between March and April 2001. Four of these cases were subsequently dismissed (Quik Print Southwest, Inc., Olympian Graphics, Inc., Demand Printing Solutions, Inc. and Demand Printing, Inc.). The remaining three cases were at first jointly administered and later substantively consolidated. (Xyan.Com, Inc., Xyan–Needham, Inc. and Quik Print, Inc.) The Xyan group of companies discontinued business operations shortly after inception of the Chapter 11 cases and thereafter embarked on a course of liquidation. To this end, Xyan and the Committee filed an amended joint liquidating plan of reorganization on May 10, 2002, which plan was confirmed by Order of this Court dated July 2, 2002. The Plan, at Article 9 thereof, invested the Committee with the exclusive right to assert the instant cause of action against Banta.

The Committee's cause of action against Banta, as noted, centers on a transaction in which the assets of Xyan–Needham were sold to Banta. The background and details of the transaction are central to an understanding of the issues in this litigation, so they will be reviewed in detail herein.

Banta is a Wisconsin corporation which is also engaged in the printing business. In January 2000, Banta acquired an equity ownership interest in Xyan through the investment of $3,000,000. It is unclear from the record what number of shares Banta received for this investment. Banta asserts that the decision to make its initial investment in Xyan was prompted by its

recognition that Xyan had accumulated a national network of digital printing capabilities and that access to these could enhance Banta's abilities to service its own customer's needs. At the time Banta also owned a separate page production subsidiary corporation in Needham, Massachusetts known as Banta Integrated Media—Needham, Inc. (BIM—Needham).

In May 2000 Banta made an additional $3,000,000 investment in Xyan, receiving 739,127 shares of Xyan common stock in exchange. At that time Banta sold BIM—Needham to Xyan for 286,826 additional shares of Xyan stock, and also sold an unincorporated Banta digital printing division, known as Banta Integrated Media—Eden Prairie, to Xyan for an additional 77,222 shares of Xyan common stock.[1] Banta made a further investment of $1,000,000 in Xyan in December 2000 for an undetermined number of shares, and at the same time loaned an additional $1,000,000 to Xyan on an unsecured basis.

The Committee asserts, and it appears undisputed, that by reason of the foregoing events and by the end of 2000, Banta had invested approximately $8,000,000 in Xyan and had become one of its principal equity holders. The Committee asserts, and again it appears undisputed, that in recognition of this fact Xyan and Banta formed a joint management committee to coordinate the business efforts of the two companies, and that after the May 2000 transaction Banta's Chief Executive Officer became a member of the Xyan Board of Directors.

Whatever the parties' hopes and plans might have been the fortunes of Xyan nevertheless quickly deteriorated. By December 2000 Xyan was on the verge of

---

1. The Committee asserts that the BIM—Needham and Eden Prairie sales resulted in a transfer to Banta of 10% of the then outstanding common stock of Xyan. Banta disputes this and asserts that on a fully diluted basis, the figure is closer to 2%.

being unable to meet its payroll and faced bankruptcy absent an additional cash infusion. Xyan approached Banta and another of its major investors, a hedge fund known as "Circle T Investors," with the request for an additional investment of $2.5 million from each. That request, at least on the part of Banta, was rejected as made, but in the alternative a different transaction was structured. As set forth in two documents, each dated January 29, 2001 and entitled "Option Agreement," Xyan granted Banta an option to reacquire certain of the assets of BIM—Needham and Eden Prairie which had previously been sold by Banta to Xyan. The terms of these agreements called for Banta to pay $1,317,481.50 upon execution of the Option Agreement for the option rights to the BIM—Needham assets, and $612,822.20, upon execution, for the option rights to the Eden Prairie assets. The Agreement required a further payment of an additional $100,000 upon any exercise of the option rights. The balance of the $2.5 million cash infusion sought from Banta (approximately $370,000) was extended by Banta to Xyan in the form of a loan.

Banta's option rights ran through December 31, 2001 and were exercisable subject to identical conditions set forth at Paragraph 1(b) of each agreement, as follows:

> 1. . . .
>
> . . . (b) Optionee shall have the right at its sole discretion to exercise the Option upon the earlier to occur of any of the following: (i) issuance of a written notice of a meeting of the Board of Directors of Optionor, stating that one of the purposes of the meeting is the consideration of authorizing the filing of a bankruptcy petition, or (ii) the holding of a meeting of the Board of Directors at which a proposal authorizing the filing of a bankruptcy petition on behalf of the Optionor

is proposed for consideration by the Board of Directors.

In the event the above conditions did not obtain by December 31, 2001, the option rights expired and Banta would receive no further consideration for the payments made upon execution of the Option Agreements.

The cash infusions from Banta, and Circle T investors—which apparently had separately agreed to Xyan's request for the investment of an additional $2.5 million—did not solve Xyan's financial difficulties. On March 29, 2001, Xyan's Board of Directors met for the express purpose of authorizing a bankruptcy filing. The next day Banta exercised its rights under the two Option Agreements and reacquired the assets of BIM—Needham and Eden Prairie. The following day, March 31, 2001, the initiation of the Xyan Chapter 11 cases commenced.

The Committee's complaint challenges only the legitimacy of the resale of the BIM–Needham assets. In this respect the Committee argues that the sale was the product of actual fraud or, at a minimum, was constructively fraudulent. In furtherance of its position the Committee asserts, first and foremost, that the consideration paid for the BIM–Needham assets pursuant to the Option Agreement was far below their fair value. Banta disputes this contention, but concedes for purposes of the present motion that the valuation question is a material fact in this case as to which there exists a genuine dispute between the parties.

Valuation aside, the Committee further argues that there is substantial record evidence which supports a finding of actual and/or constructive fraud as to the Needham option transaction. The Committee's position on this score is premised at the outset upon its contention that Xyan—Needham and Xyan were alter egos of one

another, such that any alleged separate corporate existence on the part of the two corporations must be disregarded. As will be discussed, *infra*, a favorable decision on this point is critical to the success of the Committee's cause of action.

Banta, for its part, defends the Needham option transaction as having been proper in all respects. Banta, in particular, contests the Committee's alter ego claims, arguing that as a matter of fact the record does not support the charge, but equally important that as a matter of law the doctrine may not be invoked in the instant circumstances. As will be discussed *infra*, the Court disagrees, and concludes, to the contrary, that the assertion of an alter ego theory is legally viable in this setting and further that the record evidence clearly demonstrates the existence of numerous triable issues of material fact.

### Legal Standard

The instant motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ. P."), which is made applicable by B.R. 7056. Pursuant to Rule 56, summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For purposes of rule 56, an issue is "genuine" if there is sufficient evidence with which a reasonable jury could find for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. In making this determination, the Court may consider any of the materials set forth in subdivision (c) of the Rule, to wit, pleadings, depositions, answers to interrogatories, admissions on file an affidavits, as well any other evidentiary materials submitted by the parties which would be admissible at trial. 10 *Collier on Bankruptcy*, ¶ 7056.05 at 7056–6 (Matthew Bender 15th ed. revised 1999). The Court must consider all of the evidence presented, drawing all reasonable inferences therefrom in the light most favorable to the nonmoving party, and against the movant. *See United States v. Premises Known as 717 South Woodward Street*, 2 F.3d 529, 533 (3d Cir.1993); *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); *Gould, Inc. v. A & M Battery and Tire Service*, 950 F.Supp. 653, 656 (M.D.Pa.1997).

The moving party has the burden of demonstrating that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party meets its burden by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party has satisfied its burden, the non-moving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Thus, the nonmoving party may not simply rest on its pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Such evidence must be sufficient to support a jury's factual determination in

favor of the nonmoving party. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is insufficient to satisfy the nonmoving party's burden. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) If the nonmoving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof of trial, the moving party is entitled to entry of summary judgment in its favor as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548.

### *Discussion.*

There are several justifications offered in the courts of the Third Circuit and beyond for piercing the corporate veil, although there is a certain degree of inconsistency as to which theory courts apply.[2] For example, the court in *Red Bell Brewing Co. v. GS Capital, L.P. (In re RBGSC),* 242 B.R. 851 (Bankr.E.D.Pa. 2000), recited several of the theories:

— only when the person in control of the corporation uses that control to further personal interests;

— only when necessary to avoid injustice to another party;

— to prevent an injustice, illegality or fraud;

— when recognizing the corporate entity would result in a violation of public policy or protect someone from liability for a crime;

— only when the corporation was an artifice and a sham to execute illegitimate purposes and an abuse of the corporate fiction and immunity that it carries;

— if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder.

*In re RBGSC,* 242 B.R. at 859 (citations omitted).

■ Despite inclusion of the limiting term "only" in the articulation of some of the theories, different theories are often used across the cases without explanation as to why the court chose one theory over the others.[3] The only consistency seems to be that each corporate piercing decision looks to a number of factors indicating disregard for the corporate form, and then applies one of the theories to justify the court's conclusion whether equity requires the veil to be pierced.[4]

2. "The confusion existing in the corporate veil-piercing area is the product of several factors. Legal writers fail to agree on a single definition of the corporate entity; a similar lack of consensus plagues corporate veil-piercing jurisprudence. To compound the problem, courts make sloppy use of veil-piercing terminology, often confusing tests: 'Devoid of any consistent doctrinal basis, the cases themselves defy any attempt at rational explanation.'" Michael J. Gaertner, *Reverse Piercing the Corporate Veil: Should Corporation Owners Have It Both Ways?,* 30 Wm. & Mary L.Rev. 667, 678 (Spring 1989), *quoting* Landers, *A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy,* 42 U. Chi. L.Rev. 589, 620 (1975).

3. *See* Gaertner, *supra* note 1 ("A number of corporate veil-piercing theories exist, but no single test prevails.").

4. Factors to consider in determining whether the corporate veil can be pierced include (1) a failure to observe corporate formalities; (2) non-payment of corporate dividends; (3) insolvency of the debtor corporation at the time of a significant action or transaction; (4) siphoning of corporate funds by the dominant shareholder; (5) non-functioning of the other officers or directors of the corporation; (6) lack or absence of corporate records; (7) establishment that the corporation is merely a sham for the operations of the dominant stockholder(s); and (8) undercapitalization of

One of the most-cited standards within the Third Circuit comes from the *Zubik* decision, where the court stated that it may disregard the corporate form to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir.1967), *citing Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550 83 L.Ed. 669 (1939); *Anderson v. Abbott,* 321 U.S. 349, 355, 64 S.Ct. 531, 535, 88 L.Ed. 793 (1944); *United States v. Goldberg,* 206 F.Supp. 394, 405 (E.D.Pa.1962), *aff'd on other grounds,* 330 F.2d 30 (3rd Cir.1964), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); *Tucker v. Binenstock,* 310 Pa. 254, 263, 165 A. 247, 250 (1933). *See American Bell v. Federation of Telephone Workers of Pennsylvania,* 736 F.2d 879, 886–87 (3d Cir.1984) (stating that approach set out in *Zubik v. Zubik,* 384 F.2d 267 (3d Cir.1967) [prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime], is not exclusive: "We have suggested that there may be 'a less precise notion that the corporations simply acted interchangeably and in disregard of their corporate separateness.'"), *quoting Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1070 (3d Cir.1979); *see also Mayerson v. Washington Manufacturing Co.,* 58 F.R.D. 377, 385 (E.D.Pa. 1972) ("Moreover, even if it could be said that the Subsidiary were the mere instrumentality of the Parent, that circumstance by itself would not justify imposition of liability. For it has long been the law that

the corporate entity is only ignored when the ends of justice require it.... Some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction."), *quoting American Trading & Production Corp. & Fischbach v. Moore, Inc.,* 311 F.Supp. 412, 416 (N.D.Ill.1970).

■ Against the backdrop of the above jurisprudence, the Court turns first to Banta's contentions that the Committee's alter ego or veil piercing argument is unsustainable as a matter of law insofar as its claims of constructive fraud. In this respect, Banta argues that the Committee can never carry its burden of proof under PUFTA or Bankruptcy Code § 548(a)(1)(B) because it cannot establish any of the insolvency prongs of the two part conjunctive test for constructive fraud. On this point, the parties observe, and the Court agrees, that the elements of a constructive fraud cause of action under State or Federal law are essentially identical and consist of 1) proof that the transferee received less than reasonably equivalent value for the exchange at issue, and 2) proof that the transferee A) was insolvent on the date of the transfer or became insolvent thereby; B) was engaged, or was about to engage, in a business or transaction for which its remaining assets represented unreasonably small capital; or C) intended to incur, or believed that it would incur, debts that would be beyond the transferee's ability to pay as they matured.

Banta argues that the Needham business, once sold to Xyan, had been constituted by Xyan as a separate corporation

the corporation. *In re RBGSC,* 242 B.R. at 859–60, *citing Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521 (3d Cir.1994); *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981); *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.,* 758 F.Supp. 1054, 1059

(W.D.Pa.1990); *Ansel Properties, Inc. v. Nutri/System Assocs. (In re Nutri/System),* 178 B.R. 645, 654 (E.D.Pa.1995); and *In re Nutri/System Inc.,* 169 B.R. 854, 870 (Bankr. E.D.Pa.1994).

known as Xyan—Needham, Inc. Banta further argues that the balance sheet of Xyan—Needham, both before and after Banta's exercise of the rights to reacquire certain of the Needham assets, conclusively demonstrates that the subsidiary corporation's assets at all times exceeded its liabilities. Furthermore, as it appears that Xyan—Needham discontinued ongoing business operations after the sale of its operating assets back to Banta, Banta maintains that there can be no argument made that by reason of the transaction Xyan—Needham was left with unreasonably small capital, or was rendered unable to pay its debts as they became due. Thus, says Banta, the Committee's constructive fraud claims must fail as a matter of law.

Banta notes that, faced with this seemingly insuperable barrier to relief, the Committee has alleged that Xyan—Needham was the alter ego of Xyan such that the assets and liabilities of the two entities should be viewed as one. It appears beyond question that doing so would produce a scenario in which the insolvency test for constructive fraud would be satisfied, as the liabilities of Xyan were vast and its assets in contrast quite small. Banta argues, however, that this is an impermissible invocation of the doctrine of "piercing the corporate veil" which is not legally cognizable. The Committee disagrees and the Court concurs.

■ Banta is of course correct that the Committee's legal theory in this respect does not represent the "classical" case of corporate veil piercing. Classical piercing of the corporate veil is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation. *In re Blatstein,* 192 F.3d 88, 100 (3d Cir.1999) (Citations omitted)

Indeed, both parties recognize that this litigation instead involves a variation on the less common request for a "reverse piercing" of the corporate veil. In a reverse piercing case the assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same. *Id.*

■ Banta does not challenge the existence of the doctrine of reverse veil piercing or its legitimacy in some circumstances. Rather, Banta argues that its invocation here represents an unprecedented extension of the doctrine. In this respect, Banta states that it has found no reported decision where reverse piercing was employed to collapse a solvent corporation into an insolvent corporation in a constructive fraud litigation.

The Court views Banta's vision, in this respect, as myopic. There are of course a number of decisions which have sanctioned the use of reverse piercing as a cognizable legal theory, although, to be sure, only exceptional circumstances warrant granting this unusual remedy. *In re Mass,* 178 B.R. 626, 627 (M.D.Pa.1995). Banta's insistence, however, that the doctrine cannot under any circumstances be used where the corporation whose veil is sought to be pierced can demonstrate its own stand–alone solvency is conclusory. Just as Banta argues that no court has accepted the proposition, no Court appears to have categorically rejected it either. Apparently, it must suffice to say that there is no case squarely "on all fours" with this one. For its part, the Court views the distinction which Banta draws to be without any particular dispositive legal significance in the present context. Indeed, it only serves to distract attention from the relevant legal question, which is whether the corporations can be shown in fact to have been alter egos of one another and whether

justification exists to treat them as one. There is nothing in the jurisprudence which informs veil piercing to suggest a bright line or litmus test limitation such as Banta urges. The Court accordingly holds that if under principals of applicable law the Committee can establish that Xyan and Xyan—Needham were alter egos of one another, the Committee is not barred as a matter of law from prosecution of its constructive fraud claims by reason of the configuration of the assets and liabilities of the two entities.

This leads to the next important inquiry; to wit: have the requisite allegations been made and is the record evidence in support of them sufficient for the Committee to resist the present motion for summary judgment. The Court answers these questions in the affirmative.

█ However, before analyzing the justification proffered by the Committee in support of its veil piercing theory, and the evidence offered by both parties thereon, the Court pauses to address another threshold argument Banta advances which it once again maintains operates to bar the Committee's cause of action as a matter of law. On this score, Banta argues that in order to successfully establish grounds for veil piercing it is essential for a plaintiff to present evidence of intentional misconduct in the misuse of the corporate form. Banta contends that there is no such evidence to be found anywhere in the voluminous record submitted to the Court in connection with this motion, and that the Committee's law suit for this reason alone must fail. The Court disagrees. In *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir.2001) our Court of Appeals discussed factors of the alter ego test as they exist in the Third Circuit (*Id.* at 484) and noted some of the differences between its test and others. One of the most important differences across jurisdictions, the Court

observed, seemed to reside largely on whether an element of fraudulent intent, inequitable conduct or injustice is explicitly required. *Id.* at 484 n. 2. The Court of Appeals effectively eliminated further confusion in this Circuit on that point in its recent decision in *Trustees of the National Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk,* 332 F.3d 188 (3d Cir.2003) wherein the Court stated:

> Nonetheless, in determining whether to "pierce the corporate veil," we considered the following *factors:* gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder. (Citations Omitted).

We have never characterized these "factors" as elements of a rigid test. *See, e.g., American Bell,* 736 F.2d at 886 (these factors are "not the exclusive approach"); *Pisani,* 646 F.2d at 88. What we have done is to essentially inquire "into whether the debtor corporation is little more than a legal fiction." *Pearson,* 247 F.3d at 485. While "piercing of the corporate veil is an equitable remedy," *In re Blatstein,* 192 F.3d at 100, and therefore "the situation must present an element of injustice or fundamental unfairness, ... a number of these factors can be sufficient to show such unfairness." *Pisani,* 646 F.2d at 88 (quotation omitted); *Because our test does not require proof of actual fraud as a prerequisite for piercing the corporate veil, the District Court's failure here to require that the plaintiff prove that*

*American was established as a "facade" was not an error of law.* (emphasis added)

332 F.3d at 194.

In fairness to Banta, the Court notes that the Appellate Court also added in a footnote accompanying the above text the caveat that where the conduct alleged to justify the piercing of the corporate veil is that the corporation as a whole is a "sham" or "facade" a finding "akin to . . . fraud" is necessary. *Citing, Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503–1522 (3d Cir.1994) Notwithstanding this caveat, the Court holds that based on the decision in *National Elevator,* Banta's contention as to the absolute necessity of a finding of fraudulent intent in all corporate veil piercing cases must be rejected.[5]

The Court turns then to the question of whether record before it with respect to the Committee's request for reverse veil piercing and its claims of constructive and actual fraud withstand Banta's request for summary judgment. Bearing in mind that in the context of a Motion for Summary Judgment, the Court, in consideration of the evidence, is to draw all reasonable inferences therefrom in the light most favorable to the non-moving party, the Court finds there to be substantial evidence in the record before it from which a reasonable jury could find for the Committee on the claims made herein. The Court thus finds in favor of the Committee with respect to the present Motion.

### A. *Constructive Fraud*

■ Turning first to the Committee's constructive fraud claims, the Court notes that many genuine issues of material fact are in dispute between the parties concerning the alleged separate corporate existence of Xyan—Needham. The Committee, for example, argues that corporate formalities were completely disregarded. In this respect, the Committee asserts, and there is evidence in the record which supports the facts, that Xyan—Needham had no separate officers or directors, held no director or shareholder meetings, and in fact had no employees of its own, all Xyan—Needham workers apparently being on the payroll of Xyan. Xyan leased the space in which Xyan—Needham did business and paid the rent thereon itself. Xyan—Needham did not issue its own invoices, rather its billings were issued on Xyan invoice stationary with no reference thereon to Xyan—Needham Corporation. Receipts for Xyan—Needham services were remitted directly to Xyan and deposited in Xyan's bank account. All of Xyan—Needham's operating expenses were paid directly by Xyan and it does not appear that Xyan—Needham even had its own bank account. Xyan—Needham issued no dividends and does not appear to have maintained a separate set of corporate books and records. Of particular significance also is the presence in the record of testimony from key employees of Xyan, including Xyan's Chief Executive Officer, to the effect that they were unaware that Xyan—Needham was a separate corporation, but believed, to the contrary, that it was one of Xyan's several unincorporated divisions. Indeed, there is testimony of a similar sort from Banta's own Chief Executive Officer. The Committee stresses, moreover, that although Xyan—Needham may have been formally incorporated when the assets of BIM—Needham were sold in May 2000, the records of the Wisconsin Corporate Bureau reflect that the amendment which changed the name of the enti-

---

**5.** The Court notes that the Committee in fact inserts the presence of actual fraudulent intent on the part or Banta in connection with the Needham option transaction. Its contentions in this respect will be considered *infra.*

ty from BIM—Needham to Xyan—Needham was not submitted for filing until January 30, 2001, the day after the execution of the Option Agreement. On the latter score, the Committee notes further that it was only in conjunction with the execution of the Option Agreement that a Xyan employee was first named as an officer of Xyan—Needham, ostensibly so that someone on behalf of Xyan—Needham could sign the agreement on behalf of that corporation.

The Committee further notes that under the Option Agreement between Banta and Xyan—Needham, the triggering event necessary for Banta to exercise the option rights was a meeting of Xyan—Needham's Board of Directors called for the purpose of considering a bankruptcy filing. The Committee stresses that no such meeting ever occurred. Rather, a meeting of Xyan's Board of Directors was held for that purpose and it was the result of that meeting, held on March 29, 2001, which led to Banta's exercise of the option rights and the Bankruptcy filing of the Xyan group of companies. Rounding matters out, the Committee points out that the consideration called for under the Option Agreement was paid by Banta directly to Xyan and not to Xyan—Needham.

The Committee asserts that the totality of the evidence in the record now before the Court clearly supports its charge that Xyan—Needham was completely dominated by Xyan and should be viewed as its alter ego. The Committee asserts that if the Court does so, the Committee will then successfully demonstrate that Xyan—Needham's assets were sold to Banta for much less than their reasonably equivalent value. Reverse piercing of the corporate veil is necessary and appropriate in this instance, says the Committee, in order to prevent injustice to the creditors of Xyan

and rectify what will otherwise will be an egregious abuse of the corporate form.

Banta, for its part, argues in response that Xyan—Needham was a stand-alone entity that conducted its business operations independent of input or supervision from Xyan. Banta maintains that the relationship between Xyan and Xyan—Needham was that of a typical parent and subsidiary corporation and points to certain record evidence which it contends is supportive of its position, including testimony from Xyan employees. Banta insists that the matters cited by the Committee are exaggerated and do not amount to evidence which would support the conclusion that Xyan—Needham was a sham corporation, dominated and controlled by Xyan.

As previously noted, it is not the Court's function at this stage to weight the conflicting evidence, rather, the Court must evaluate the evidence in the light most favorable to the non-movant in the course of determining whether the matter must go to trial. Having done so, the Court will deny Banta's motion as to the Committee's constructive fraud claims.

### B. *Intentional Fraud.*

■ Turning next to the Committee's allegations of intentional fraud, the Court again notes that there are important questions on which Banta and the Committee disagree. In assessing their disagreements the Court is mindful of certain factors which courts traditionally are advised to consider in reaching a determination of actual fraudulent intent. These are set forth in PUFTA at § 5104(b) as follows:

(b) Certain factors.—In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa.C.S.A. § 5104(b).

Banta concedes only that valuation is an open issue in this instance, but argues that none of the other so called "badges of fraud" are present. The Court disagrees. If the alter ego issue is ultimately resolved adversely to Banta, the insolvency of the transferor factor is certainly present. The Court notes also that the sale was of substantially all of Xyan—Needham's operating assets and was made on terms which record evidence supports as being imposed by Banta without negotiation.[6]

There is also evidence which tends to support the allegation that the sale was made to an insider. Banta's Chief Executive Officer was a member of Xyan's Board of Directors, and Banta was a substantial equity investor of Xyan. It is reasonable to assume that Banta would have had intimate knowledge of the desperate financial position of Xyan. Given the testimony of Banta's own CEO that he himself considered Xyan—Needham to be merely a division of Xyan, a reasonable inference could be drawn that Banta believed the Corporate group to be insolvent, and that the option transaction was structured to enable Banta to extract value from the company before its collapse. Support for this inference may also be seen in record evidence that the Xyan—Needham assets sold back to Banta were never appraised, that no "fairness" opinion exists, and that certain Xyan executives protested at the time that the sale price was unfairly low.

The timing of events can scarcely be overlooked either. The prospect of bankruptcy was clearly on the horizon by the close of calendar year 2000, and the "defective" bankruptcy resolution by the Xyan Board of Directors followed a mere two months later. On this score, the Committee emphasizes as well that the terms of the option transaction itself are circumstantial evidence of fraudulent intent. In this regard, the Committee notes that if the requisite Board meeting of Xyan—Needham failed to occur within 11 months of the execution of the Option Agreement, Banta would have paid $2 million and re-

---

**6.** On this score, the Court notes that Banta points to other record evidence to the effect that Xyan—Needham's accounts receivable (approximately $616,000) were its most valuable asset, and not the assets which were sold to Banta, which had a book value of approximately $382,000. This factor in itself is of questionable help, since it raises relevant other questions of its own, such as why Banta would pay 1.3 million dollars for assets it contends had a value of only roughly 1/3 that sum.

ceived nothing in return. The Committee argues that it is illogical to assume that Banta would enter into such a curious and seemingly one sided arrangement. Rather, says the Committee, it is more reasonable to assume that as the parties executed the Option Agreement, they knew that Xyan's bankruptcy filing was a foregone conclusion. The Committee notes that presumably to insulate Banta from future challenge, the Option Agreement contained suspicious recitals that the transaction was bona fide and for fair value. *See Liebersohn v. Zisholtz*, 225 B.R. 868 (Bankr. E.D.Pa.1998) (listing among badges of fraud a statement in the instrument effecting the transfer that it is in fact bona fide.) *See also Morse Operations, Inc. v. Goodway Graphics of Virginia, Inc. (In re Lease–A–Fleet, Inc.)*, 155 B.R. 666, 674 (Bankr.E.D.Pa.1993), *citing Bank of Chester County v. Cohen (In re Cohen)*, 142 B.R. 720, 728 (Bankr.E.D.Pa.1992).

As with the claims of constructive fraud, Banta discounts virtually of the Committee's arguments vis-a-vis, actual fraud, arguing essentially that the picture has been grossly distorted. As with the constructive fraud claims, however, it is not the Court's function here to reconcile the conflicting evidence, but rather to apply the standards applicable to a motion brought under F.R.C.P. 56. The Court has done so and concludes that, just as with the Committee's claims of constructive fraud, there are genuine disputed issues of material fact as to the asserted claims of actual fraud. Banta accordingly has no entitlement at this stage to judgment as a matter of law and its motion will therefore be denied in its entirety.

An appropriate Order follows

### ORDER

AND NOW, upon consideration of the Motion of Defendant, Banta Corporation for Summary Judgment as to all four counts of Plaintiff's Complaint, the Answer in opposition thereto filed by Plaintiff, and after hearing thereon held June 10, 2003, it is hereby:

ORDERED, that for the reasons stated in the accompanying Opinion, the Motion shall be and hereby is denied.