# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3401

_____

Jody DeBold,                                    *
                                               *
            Appellee,                          *
                                               *   Appeal from the United States
      v.                                       *   Bankruptcy Appellate Panel
                                               *   for the Eighth Circuit.
E. Rebecca Case, Chapter 7 Trustee,            *
                                               *
            Appellant.                         *

_____

Submitted: March 13, 2006
Filed: June 26, 2006

_____

Before WOLLMAN, FAGG, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

      E. Rebecca Case, bankruptcy trustee (Trustee) for Tri-River Trading, L.L.C. (Tri-River), appeals the decision of the Bankruptcy Appellate Panel (BAP) reversing the bankruptcy court and granting declaratory judgment in favor of Jody DeBold (DeBold).  For the reasons that follow, we affirm the decision of the BAP.

## I.    BACKGROUND

      This case involves the allocation of settlement proceeds from a lawsuit between former partners of a failed joint venture.  We briefly summarize the facts previously

detailed in two published opinions. <u>DeBold v. Case (In re Tri-River Trading, LLC)</u>, 317 B.R. 65 (E.D. Mo. 2004), <u>rev'd</u>, 329 B.R. 252 (8th Cir. 2005).

In March 1999, Phil Thornton (Thornton), general manager of Jersey County Grain Company (Jersey), approached DeBold about launching a new barge freight trading company. Thornton prepared pro formas projecting the financial success of the proposed joint venture and assured DeBold that Jersey would use Tri-River exclusively for all of Jersey's freight trade. In April 1999, DeBold left her lucrative freight trader position and joined Jersey to found Tri-River. DeBold and Jersey were Tri-River's only members and each invested $100,000 to capitalize Tri-River. Jersey arranged for a $1,000,000 unsecured line of credit to enable Tri-River to trade freight with several transportation companies. Article 4.2 of Tri-River's operating agreement designated DeBold as the manager of Tri-River, and Article 4.1 listed DeBold's duties and authority, recognizing DeBold had full responsibility and exclusive and complete management discretion.

In Tri-River's first months of operation, under DeBold's management and with Jersey using Tri-River for all its freight trade, Tri-River turned a slight profit in a less than optimal market. During Tri-River's first year in business, Thornton allegedly began making sexual advances toward DeBold. DeBold rebuffed Thornton's advances and reported Thornton's behavior to Hugh Moore Jr. (Moore), president of Jersey's board of directors. Soon after, Thornton obtained an opinion from Jersey's legal counsel that Jersey had no obligation to deal exclusively with Tri-River under Tri-River's operating agreement. Jersey then began purchasing Jersey's freight transportation from other freight traders. Thornton also caused the withdrawal of Tri-River's unsecured line of credit. Jersey's board of directors attempted to sell Jersey's interest and withdraw from Tri-River. Without Jersey's trade commitment, Tri-River was forced to surrender its future shipping contracts and unwind its market position at an estimated loss of $800,000.

DeBold and Tri-River filed a six-count complaint in Missouri state court (state court litigation) asserting claims against Jersey, Thornton, and Moore for breach of contract, breach of oral contract, tortious interference with business relationships, and breach of fiduciary duty. DeBold asserted personal claims against Thornton and Jersey for fraudulent and negligent misrepresentation. On February 12, 2003, the day trial was set to begin, the parties settled the lawsuit for $800,000. The settlement agreement did not specify an allocation of the settlement funds between DeBold and Tri-River. DeBold allocated seven-eighths of the gross settlement ($700,000) to herself and one-eighth ($100,000) to Tri-River. According to DeBold, Jersey agreed to this allocation during settlement negotiations, but later declined to acknowledge the allocation in the settlement agreement.

## A.    Proceedings Before the Bankruptcy Court

On February 27, 2003, fifteen days after the state court litigation settled, creditors filed an involuntary bankruptcy petition against Tri-River. DeBold signed Tri-River's bankruptcy schedules and listed $67,000[1] in net settlement proceeds as an asset of Tri-River's bankruptcy estate. After the Trustee refused to agree to the allocation, DeBold filed a declaratory judgment action in bankruptcy court, claiming entitlement to $700,000 of the settlement proceeds. The Trustee asserts the entire settlement amount belongs to the bankruptcy estate.

To determine the proper allocation of the settlement proceeds, the bankruptcy court conducted a bench trial to ascertain which party would likely have prevailed in the state court litigation had the case proceeded to trial. The Trustee, DeBold, and David Corwin (Corwin), who represented DeBold and Tri-River in the state court litigation, participated in the bench trial. DeBold testified she agreed to settle the case for $800,000 to be split seven-eighths for DeBold, and one-eighth for Tri-River, based

---

[1]Tri-River and DeBold incurred $271,169.62 in attorney fees and costs leaving net settlement proceeds of $528,830.38. One-eighth of that amount is approximately $67,000.

on information DeBold received during discovery of the state court litigation regarding the strength of her claims, the weakness of Tri-River's claims, and DeBold's damages. DeBold testified that one indication of the strength of her claims was that Jersey's insurer paid $200,000 of the settlement based on DeBold's sexual harassment allegations. DeBold further testified her damages included her (1) initial capital investment of $100,000; (2) "compromise[] in the way of salary"; (3) "lack of being able to get a bonus from Tri-River"; and (4) "lack of a future salary." DeBold presented portions of the deposition testimony of damages expert Thomas Hoops (Hoops), taken during the state court litigation. The bankruptcy court did not allow DeBold to testify regarding advice Corwin had given DeBold during the state court litigation, ruling DeBold's testimony would not constitute the best evidence as Corwin was present in the courtroom.

After Corwin took the stand, the bankruptcy court ruled an attorney-client privilege between Tri-River and Corwin precluded Corwin from testifying about Tri-River's claims. Accordingly, Corwin's testimony was limited to the advice he had given DeBold about DeBold's personal claims, including: (1) DeBold's misrepresentation claims were strong because clear evidence of Thornton's sexual misconduct provided jury appeal and Thornton's letter, making promises and representations to DeBold, offered proof Thornton induced DeBold to leave her former employer; (2) DeBold's contract claims probably could not be maintained under Article 11.3 of Tri-River's operating agreement; (3) the breach of fiduciary duty claim was barred by Missouri law and it was Corwin's intention not to submit the claim to the jury; and (4) Corwin never intended to file a sexual harassment claim, but would use the evidence of Thornton's sexual misconduct, which "drove everything," including Thornton's intent to defraud and deceive DeBold.

The Trustee offered a series of exhibits and introduced portions of the deposition testimonies of Hoops and DeBold, but did not present any witnesses. In closing argument, the Trustee asked the bankruptcy court to allocate $56,314.49 to DeBold and $472,517.89 to Tri-River.

The bankruptcy court concluded Tri-River and DeBold had proven liability on the breach of contract, tortious interference, and breach of fiduciary duty claims. The bankruptcy court next concluded DeBold's misrepresentation claims failed because DeBold had not proven Thornton's initial proposal was made for the purpose of engaging DeBold in a personal relationship and DeBold left her former employer to pursue her own company.

On the issue of damages, the bankruptcy court determined Tri-River had proven damages in excess of $800,000, while DeBold had only shown speculative damages. The bankruptcy court reasoned, because DeBold had no valid expectation of future employment in the gradually downward turning barge freight trade industry, DeBold failed to prove Thornton's actions caused DeBold to lose her career. The bankruptcy court further reasoned DeBold had been well compensated while working for Tri-River, so equity required payment to Tri-River's creditors before DeBold was entitled to a distribution of profits. Based on these findings, the bankruptcy court denied DeBold's declaratory judgment and awarded Tri-River all the net settlement proceeds.

## B.    Proceedings Before the BAP

DeBold appealed the decision to the BAP, arguing the bankruptcy court (1) ignored the valid, prepetition allocation of settlement proceeds; (2) erred in its conclusions regarding the viability of the state court claims; and (3) erred in holding the attorney-client privilege barred portions of Corwin's testimony. The BAP reversed the bankruptcy court, holding (1) DeBold did not have the authority under Missouri law, see Mo. Rev. Stat. § 347.088.3, or under the terms of Article 4.1 of Tri-River's operating agreement, unilaterally to allocate the settlement proceeds between herself and Tri-River without the consent of Tri-River's other members; (2) the bankruptcy court erred in holding DeBold could not recover on her misrepresentation claims against Jersey and Thornton; (3) the bankruptcy court erred in holding DeBold's damages were speculative; (4) the breach of contract and fiduciary duty claims failed because Tri-River's members were immunized from liability against such claims under Missouri law, see Mo. Rev. Stat. § 347.090, and under Article 11.3

of Tri-River's operating agreement; (5) the bankruptcy court erred in excluding Corwin's testimony regarding the settlement value of the lawsuit; and (6) DeBold was entitled to seven-eighths of the gross settlement proceeds and Tri-River was entitled to the remainder. The BAP thus remanded the case to the bankruptcy court with instructions to enter judgment in favor of DeBold in the amount of $443,476.58 and in favor of Tri-River in the amount of $85,353.80.[2] This appeal followed.

## II. DISCUSSION

Like the BAP, we review for clear error the bankruptcy court's factual findings, and we review de novo the bankruptcy court's legal conclusions, as well as its conclusions involving mixed questions of law and fact. Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Auth., 339 F.3d 702, 710-11 (8th Cir. 2003). "A finding is clearly erroneous when although there is evidence to support it . . . the reviewing court is left with the definite and firm conviction that a mistake has been committed." In re Kaelin, 308 F.3d 885, 889 (8th Cir. 2002) (quotations omitted).

The Trustee argues the BAP exceeded its scope of review by making findings of fact not found by the bankruptcy court and erred in its conclusions of law regarding DeBold's entitlement to the settlement proceeds. We disagree. After conducting our own review of the bankruptcy court's decision, we, like the BAP, are left with the definite and firm conviction the bankruptcy court's conclusions were in error. Id.

The bankruptcy court began its analysis on the faulty premise the only issue to be determined was the manner in which the net settlement proceeds should be apportioned, thereby assuming rather than determining, two threshold legal questions. First, the Trustee, not DeBold, had the initial burden of showing the estate had an ownership interest in the property. See 11 U.S.C. § 541(a)(1). As the BAP reasoned, Tri-River was a plaintiff in the state court litigation, named on the settlement checks,

---

[2]These amounts reflected reductions for attorney fees and reimbursement to Tri-River for pre-litigation expenses.

and required to endorse those checks, therefore Tri-River met its burden of showing an ownership interest, shifting the burden to DeBold to prove seven-eighths of the settlement proceeds belonged to her. See id. § 541(d).

The second threshold question ignored by the bankruptcy court was whether, under Missouri law and Tri-River's operating agreement, DeBold had unilateral authority to allocate the settlement proceeds. The BAP correctly concluded DeBold did not have such authority. See Mo. Rev. Stat. § 347.088.3 ("Except as otherwise provided in the operating agreement, every member or manager, if any, shall account to the limited liability company and hold as trustee for it any profit or benefit derived by such person without the informed consent of more than one-half by number of disinterested managers or members."). Article 4.1 of Tri-River's operating agreement did not give DeBold such authority, therefore DeBold's prepetition allocation was invalid.

We also find the bankruptcy court erred regarding the viability of Tri-River's and DeBold's claims. The bankruptcy court came to the erroneous conclusion DeBold's misrepresentation claims failed because DeBold had not proven that Thornton's true intention in forming Tri-River was to establish a personal relationship with DeBold. As the BAP correctly noted, DeBold's misrepresentation claims were not based on sexual harassment. DeBold claimed Thornton intentionally and negligently made false representations to induce DeBold to join Tri-River. The alleged misrepresentations included (1) providing DeBold with false sales projections and telling DeBold three other shippers were interested in doing business with Tri-River, (2) Jersey intended to use Tri-River for all its freight trade needs, and (3) Jersey would be instrumental in building Tri-River. Although DeBold and Corwin felt the evidence of Thornton's sexual advances gave these claims jury appeal, DeBold would not have been required to prove Thornton's sexual harassment to prove a claim of misrepresentation. See generally City of St. Joseph, Mo. v. Sw. Bell Tel., 439 F.3d 468, 478 (8th Cir. 2006) (listing the elements of a negligent misrepresentation claim under Missouri law).

-7-

Next, regarding DeBold's damages, the bankruptcy court erred in misconstruing DeBold's claimed damages. Not only did DeBold claim loss of future wages, but she also claimed loss of her initial $100,000 investment, and loss of income differential for the years she managed Tri-River. As the BAP noted, the bankruptcy court made the erroneous legal conjecture DeBold had been well compensated while working for Tri-River, and therefore equity demanded creditors be paid before DeBold received damages. Under Missouri law, neither managers nor members of a limited liability company are liable for the company's debts simply by virtue of their membership. See Mo. Rev. Stat. § 347.057. The bankruptcy court erred in its legal conclusions regarding the allocation of the settlement proceeds, erroneously focusing instead on the rights of Tri-River's creditors.

Finally, the bankruptcy court erred regarding the viability of Tri-River's breach of contract and fiduciary duty claims. The bankruptcy court concluded that although DeBold had proven liability on the contract claims, she had not proven damages. However, DeBold was not a party to the contracts, and therefore had no contractual claims against Jersey. The bankruptcy court further failed to consider defenses to Tri-River's breach of contract and fiduciary duty claims, and accordingly failed to recognize Tri-River could not have prevailed on those claims, because Jersey, as a member of Tri-River, was immunized from liability against such claims under Missouri's business judgment rule, see Mo. Rev. Stat. § 347.090.1, .2 (stating an authorized person is entitled to rely on the opinion of legal counsel in discharging his duties and is not liable (without contrary knowledge) for action taken in reliance on such opinion), and under Article 11.3 of Tri-River's operating agreement.

Although the Trustee argues the BAP should have afforded deference to the factual findings of the bankruptcy court, see Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985), the BAP questioned the bankruptcy court's legal conclusions, not its factual findings. Any other incidental factual findings relied upon by the BAP in reaching its own legal conclusions do not exceed the BAP's permissible scope of review.

-8-

The BAP analyzed the legal issues and properly applied the law. The BAP authored a comprehensive, well reasoned opinion, and thoroughly set out the facts and applicable legal standards. We find further elaboration unnecessary.

## III.   CONCLUSION

We affirm the judgment of the BAP.

_____