# United States Bankruptcy Appellate Panel
## For the Eighth Circuit

_____

No. 12-6058

_____

In re: David L. Juve, doing business as Juve Buying Services,
doing business as Imports Plus, Inc.; Mona L. Juve

*Debtor*s

------------------------------

David H. Heide

*Plaintiff - Appellee*

Leah T. Heide; Kaia E. Heide

*Plaintiff*s

v.

David L. Juve, doing business as Juve Buying Services,
doing business as Imports Plus, Inc.

*Defendant - Appellant*

Mona L. Juve

*Defendant*

_____

Appeal from United States Bankruptcy Court
for the District of Minnesota

_____

Submitted: February 21, 2013
Filed: April 18, 2013

_____

Before FEDERMAN, Chief Judge, SCHERMER and NAIL, Bankruptcy Judges.

_____

NAIL, Bankruptcy Judge

Debtor David L. Juve ("Debtor") appeals the final judgment of the bankruptcy court awarding David Heide ("Heide") $350,490.00 and determining that amount to be nondischargeable under 11 U.S.C. § 523(a)(2)(A). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(b). For the reasons set forth below, we reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

## BACKGROUND

Debtor and his wife (collectively, "the Juves") filed a petition for relief under chapter 7 of the bankruptcy code. Heide, his wife, and their daughter (collectively, "the Heides") commenced an adversary proceeding against the Juves, seeking both a determination that certain debts they claimed the Juves owed them were nondischargeable under 11 U.S.C. § 523(a)(2), (4), or (6) and a denial of the Juves' discharges under 11 U.S.C. § 727(a)(2) - (6).[1]

On the Heides' motion for summary judgment, the bankruptcy court found Debtor owed Heide $400,000, determined that debt was nondischargeable under

_____

[1]In their complaint, the Heides denominated the defendants as "David L. Juve and Imports Plus, Inc." In their amended complaint, the Heides denominated the defendants as "David L. Juve[,] d/b/a Juve Buying Service, d/b/a Imports Plus, Inc.[,] and Mona Juve." While the issue is not directly related to the appeal before us, we question whether an individual can in fact "do business as" a corporation.

§ 523(a)(2)(A), and granted partial summary judgment in favor of Heide against Debtor.  In the same order, the bankruptcy court ruled in favor of the Juves on the Heides' remaining causes of action under § 523 and reserved for trial the Heides' cause of action under § 727.

Before the trial was held, the parties stipulated to the entry of a final judgment incorporating the bankruptcy court's disposition of the Heides' causes of action under § 523 and dismissing the Heides' cause of action under § 727.  In the stipulation, the parties preserved Debtor's right to appeal the judgment of nondischargeability against him.  The bankruptcy court entered a judgment in accord with the parties' stipulation, and Debtor timely appealed.

On appeal, we determined the bankruptcy court had erred in granting summary judgment when two questions of fact remained, *i.e.*, whether the automobile financing arrangement should be treated as one between Heide and Debtor or one between Heide and Imports Plus, Inc., and whether Debtor obtained the majority of the funds from Heide at the time of the alleged misrepresentations regarding encumbrances (or the absence thereof) on the subject vehicles.  Consequently, we reversed and remanded.  *Heide v. Juve* (*In re Juve*), 455 B.R. 890 (B.A.P. 8th Cir. 2011).

On remand, and following trial, the bankruptcy court entered a judgment awarding Heide $350,490.00 and determining that amount to be nondischargeable under § 523(a)(2)(A).[2]  Debtor timely appealed.  On appeal, Debtor raises three

---

[2]The bankruptcy court's judgment was entered September 28, 2012.  The bankruptcy court entered an amended judgment on January 25, 2013, while this appeal was pending.  It appears "Debtor" was changed to "Debtor(s)" and "Defendant" was changed to "Defendant(s)" in the caption of the amended judgment, and the middle initial "L." was added to David Juve's name in two places in the body of the amended judgment.  Because it does not appear our leave was obtained before these apparent clerical corrections were made, as required by Fed.R.Bankr.P. 9024

issues: (1) whether the bankruptcy court's factual findings were supported by substantial evidence; (2) whether the bankruptcy court erred in concluding the debt was excepted from discharge pursuant to § 523(a)(2)(A); and (3) whether the bankruptcy court erred as to the amount of damages awarded.

## STANDARD OF REVIEW

We review the bankruptcy court's legal conclusions regarding the dischargeability of a debt under § 523(a)(2)(A) *de novo* and its findings of fact for clear error. *First Nat. Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604, 609 (8th Cir. 1997). Whether each element necessary to establish a debt is excepted from

---

and Fed.R.Civ.P. 60(a), the amended judgment is without effect. *See Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 949-50 (8th Cir. 2012).

> The underlying purpose of [Rule 60(a)], we believe, is to protect the administrative integrity of the appeal, i.e., to ensure that the issues on appeal are not undermined or altered as a result of changes in the [trial] court's judgment, unless such changes are made with the appellate court's knowledge and authorization. We note that *after* the appellate court has ruled on the appeal, the [trial] court still has the power under Rule 60(a) to clarify and correct omissions in its judgment to reflect what the court originally intended, without leave of the appellate court, "so long as the Court's corrections do not alter or amend anything expressly or implicitly ruled on by the [appellate court]." *United States v. Mansion House Center Redevel. Co.*, 118 F.R.D. 487, 490 (E.D. Mo. 1987), aff'd, 855 F.2d 524, 527 (8th Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 583 (1988).

*Kopolow v. P.M. Holding Corp*. (*In re Modern Textile, Inc*.), 900 F.2d 1184, 1193 (8th Cir. 1990).

discharge under § 523(a)(2)(A) is present is a determination of fact. *Anastas v. American Savings Bank* (*In re Anastas*), 94 F.3d 1280, 1283 (9th Cir. 1996) (cited in *Merchants Nat. Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999)). "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed.R.Bankr.P. 8013 (in pertinent part). A finding of fact is clearly erroneous when, although there may be evidence to support it, the appellate court, after reviewing the entire record, is left with a definite and firm conviction a mistake has been made. *DeBold v. Case,* 452 F.3d 756, 761 (8th Cir. 2006) (citations therein omitted); *Shaffer v. U.S. Dept. of Education* (*In re Shaffer*), 481 B.R. 15, 18 (B.A.P. 8th Cir. 2012).

## DISCUSSION

Heide, as the plaintiff, bore the burden of proving, by a preponderance of the evidence, his claim against Debtor fell within the § 523(a)(2)(A) exception to discharge. *Grogan v. Garner*, 498 U.S. 279, 286-88 (1991). As discussed in *Islamov v. Ungar* (*In re Ungar*), 429 B.R. 668, 673 (B.A.P. 8th Cir. 2010) (citations therein), *aff'd*, 633 F.3d 675 (8th Cir. 2011), we must narrowly construe exceptions to discharge, to protect the fresh start policy of the bankruptcy code.

To prove nondischargeability under § 523(a)(2)(A), Heide had to demonstrate (1) Debtor made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving Heide, (4) who justifiably relied on the representation, (5) which proximately caused Heide damage. *Treadwell v. Glenstone Lodge, Inc.* (*In re Treadwell*), 637 F.3d 855, 860 (8th Cir. 2011). Further, by the express terms of § 523(a)(2)(A), the false representation must have been a statement "other than a statement respecting the debtor's or an insider's financial condition."

The testimony[3] at trial revealed Heide and Debtor became friends when both sold vehicles at a car dealership. In the summer of 1996, with Debtor's encouragement, Heide became a commission-only salesperson at a different auto sales business called Imports Plus, Inc., which was owned by Dennis Borgen.[4] Various people, including Borgen and Debtor, owned vehicles on the Imports Plus, Inc. lot. Debtor traveled a great deal, buying vehicles at wholesale for himself and others. Heide had access to all business records at Imports Plus, Inc., except the vehicle titles, which Debtor kept at his home.

Heide and Debtor entered into an oral agreement, pursuant to which Heide would lend Debtor or Imports Plus, Inc. money to purchase vehicles.[5] When one of those vehicles was sold, Heide would be repaid the principal plus interest. He would also receive a small agreed sum ranging from $20 to $50 and, if he sold the vehicle, a sales commission.[6] Heide made the first such loan in February 1998. While Heide did not take a security interest in the vehicles purchased with his money, he understood from Debtor there was sufficient equity in the vehicles on the lot to protect his loans. Heide did not understand or believe any other person or entity held a security interest in the vehicles purchased with the funds he had loaned.[7]

---

[3]The exhibits received at trial were not included in the record on appeal.

[4]In 2001, Debtor became a 75% owner of Imports Plus, Inc.; Dennis Borgen retained the other 25% interest.

[5]Heide maintains his agreement was with Debtor; Debtor maintains Heide's agreement was with Imports Plus, Inc.

[6]Both Heide's and Debtor's testimony regarding the "agreed sum" Heide was to receive was not entirely clear. At times, they appeared to be referring to Heide's sales commission rather than a separate component of their oral agreement.

[7]Heide stated several times during his testimony he believed the vehicles purchased with his loan funds would remain unencumbered and Debtor often reassured him his funds were safe. At some point, however, Heide apparently learned

In late 2000 or 2001, the parties mutually agreed to modify the oral agreement. Going forward, the deal would no longer be "per vehicle": Heide would receive monthly interest payments on the money he loaned.[8] The parties, however, did not specify when or how Heide was to be repaid the principal. When the parties entered into the modified oral agreement, Heide did not have any concerns about the safety of his funds, because he had a trusting relationship with Debtor and because Debtor had told him he would be able to get his money back upon request, as long as he did not want it all at once. Heide continued to believe the vehicles Debtor purchased remained unencumbered; Debtor thought Heide always knew Debtor had other lenders with a security interest in some of the vehicles, because Heide came in contact with the lenders' agents at the car lot.

When the parties modified the oral agreement, Heide had loaned $186,250 for the purchase of vehicles that had not been repaid, and he loaned another $13,750, to increase the total loan to an even $200,000. In 2003, when Imports Plus, Inc. moved to a nicer lot that would permit it to carry more vehicles and more valuable vehicles, Heide loaned another $50,000. Finally, in 2004, Heide loaned another $50,000, bringing the total principal amount owed under the modified oral agreement to $300,000.[9] At that time, both Heide and Debtor believed the car lot inventory was sufficient to cover this debt.

---

other creditors had been given a security interest in the vehicles, since he testified he told Borgen in January 2008 Debtor had "encumbered all the cars."

[8]Once during his testimony, Heide indicated even after the parties entered into the modified oral agreement, he also continued to receive a fixed $20 per car sold.

[9]All Heide's loans were made by checks. It is not clear from the testimony whether the payee on these checks was Imports Plus (a "d/b/a" used by Debtor) or Imports Plus, Inc. (a separate corporate entity), and there was no testimony regarding where these checks were deposited. That information may have been included in the exhibits, but, as noted above, the exhibits were not included in the record on appeal.

Under both the original oral agreement and the modified oral agreement, Heide received regular interest payments on the agreed terms. Imports Plus, Inc. issued 1099 federal income tax statements to Heide for interest payments for tax years 2001 through 2008. Heide and his wife were also permitted to use a vehicle from the Imports Plus, Inc. lot whenever they needed to take a long car trip.

In 2005, Heide asked Debtor to name him as the beneficiary under a life insurance policy. Heide wanted the policy to cover the amount of the loans and to make it easier for Debtor's wife to pay Heide in the event Debtor passed away before the loans were repaid. Debtor agreed to do so, but he did not fulfill his promise at that time.

By Debtor's own admission, he and Imports Plus, Inc. encountered financial difficulties beginning in 2006 and 2007, and by sometime in 2006, 2007, or 2008, the equity in the vehicle inventory at Imports Plus, Inc. had eroded to the point it could no longer fully support Heide's $300,000 claim. Debtor did not advise Heide of this change in circumstances.

In October 2008, Debtor approached Heide with yet another deal. Debtor proposed to borrow money from Heide to purchase vehicles in Las Vegas, hold the vehicles until their value increased after the first of the new year, then re-sell them and split the profit evenly with Heide. Heide agreed to the new deal. In November 2008, Debtor told Heide he had bought six specific vehicles, and Heide gave Debtor $50,490 for them, noting the descriptions of the vehicles on the two checks he gave Debtor. The two checks listed Imports Plus, Inc. as the payee, and both were deposited in Imports Plus, Inc.'s bank account.

In entering into the original oral agreement in 1998, the modified oral agreement in late 2000 or 2001, and the separate Las Vegas deal in 2008, Heide did not request any documentation from Debtor regarding encumbrances on the vehicles

on Imports Plus, Inc.'s car lot. He did not request his own security interest in Imports Plus, Inc.'s assets or in Debtor's personal assets to secure the money he was lending. He did not request a financial report or other business records for Imports Plus, Inc. or for Debtor personally.

Beginning in late 2008 or early 2009, Heide became concerned about the collectability of his loans. While he was on a trip to California in late 2008, he received a number of telephone calls from buyers saying they had not received titles to vehicles they had purchased. When he returned home, Heide learned Debtor had cleaned out his office at Imports Plus, Inc. About this same time, Heide also asked Debtor to repay $10,000 of his principal, but Debtor told him he was unable to do so at the time.

In mid-January 2009, Heide flew to Florida to meet with Dennis Borgen and discuss his concerns. Heide advised Borgen Debtor had encumbered all the vehicles on the lot, buyers were not receiving their titles, and Debtor was not paying off the encumbrances on vehicles as they were sold. In Heide's presence, Borgen called Debtor to discuss the problems. Heide got on the telephone and told Debtor he wanted the titles to the six vehicles recently purchased in Las Vegas. Debtor then admitted to Heide he had never actually purchased those vehicles.

Upon Heide's return from Florida, Heide and others had a few meetings with Debtor. As a result of those meetings, Debtor presented some, but not all, of the business records Heide wanted to see, and Debtor signed a one-page document prepared by Heide and Heide's wife in which Debtor admitted personal liability to Heide for the debt.[10] On January 20, 2009, in compliance with his earlier promise, Debtor finally made Heide the beneficiary on a life insurance policy. Debtor also gave Heide the titles to four or five unencumbered vehicles, which Heide liquidated

---

[10]Debtor claims he signed this document under duress.

for about $10,000. Imports Plus, Inc. eventually closed, with almost all the vehicles being liquidated to pay its secured creditors.

At trial, Debtor admitted some of Heide's principal was used for business expenses other than the purchase of vehicles for resale. However, Heide did not establish the extent to which Debtor used Heide's loans for such other business expenses or when Debtor began to do so.

In its decision, the bankruptcy court, as it had on summary judgment, found the modified oral agreement provided each time Debtor used Heide's money, there was a re-extension of credit and an attendant assertion by Debtor that the inventory was sufficient to satisfy the funds owed to Heide.[11] The record does not support that finding. Heide himself never testified that under the terms of the modified oral agreement each use of the loan proceeds constituted a renewal of credit and created a corresponding obligation for Debtor to advise Heide if the equity in the vehicles on the lot was insufficient to support this renewed loan. *First Nebraska Educators Credit Union v. Hetrick* (*In re Hetrick*), Bankr. No. 11-80283, Adv. No. 11-8045, 2012 WL 694553, at *3 (Bankr. D. Neb. March 1, 2012). Heide even acknowledged Debtor never promised he could repay Heide's principal all at once, should he demand its return. What the record did show, when the parties made the modified oral agreement, was Heide was no longer lending money on a per vehicle basis, he increased his loan to an even $200,000, he agreed to be paid monthly interest on that sum at a specified rate, and the money would continue to be used to purchase

---

[11]The bankruptcy court's finding was, "In other words, as Heide vehicles were sold, instead of being repaid the principal as was his right at any particular time, Heide re-extended the credit and use of the proceeds to [Debtor], and [Debtor] repeatedly borrowed those funds anew, all based upon [Debtor]'s ongoing assertions of the equity and liquidity of the Heide inventory sufficient to satisfy the entire balance of funds owning [*sic*] to Heide."

-10-

inventory for the car lot. The record does not show the modified oral agreement contained any other specific terms.

Further, when the modified oral agreement was made, to the extent Debtor made a representation there was sufficient equity in the vehicles on the lot to repay the $200,000, the record does not show that statement was false. When Heide's loan reached a total of $300,000 under the modified oral agreement, to the extent Debtor made a representation there was sufficient equity in the vehicles on the lot to repay the $300,000, again the record also does not show that statement was false. In fact, both Heide and Debtor testified they believed equity in the lot's vehicles was sufficient to support Heide's full claim when he made his last loan in 2004.

As to Debtor's use of the funds other than for the agreed purpose of purchasing vehicles for the car lot's inventory, Heide did not establish when or the extent to which Debtor used the loans other than for purchasing inventory. Heide also did not establish Debtor's use of the funds other than for purchasing inventory constituted more than a breach of contract. *See Belfry v. Cardozo* (*In re Belfry*), 862 F.2d 661, 663 (8th Cir. 1988).

In sum, the record does not support the bankruptcy court's finding that Debtor made a fraudulent representation to Heide concurrent with Heide's loans under the modified oral agreement. We are thus left with a definite and firm conviction a mistake has been made. *Marcusen v. Glen* (*In re Glen*), 639 F.3d 530, 532-33 (8th Cir. 2011), *Reingold v. Shaffer* (*In re Reingold*), Bankr. No. 10-24329, Adv. No. 10-1903, 2013 WL 1136546, at *5-6 (B.A.P. 9th Cir. March 19, 2013); and *Aslakson v. Freese* (*In re Freese*), 472 B.R. 907, 917-19 (Bankr. D.N.D. 2012). Accordingly, we

reverse the bankruptcy court's judgment to the extent it determined $300,000 of the amount Debtor owes Heide is nondischargeable.[12]

We reach a different conclusion, however, regarding the $50,490 Heide loaned Debtor under the Las Vegas deal. The record demonstrates the Las Vegas deal was separate and apart from Heide's $300,000 loan under the modified oral agreement. Under the Las Vegas deal, Heide and Debtor agreed Debtor would buy several vehicles of a certain type, hold them in Las Vegas until prices improved, and resell them in Las Vegas. The vehicles were never intended for Imports Plus, Inc.'s lot. Debtor took the money under false pretenses, having knowingly represented to Heide he had already purchased the agreed vehicles in Las Vegas, when he had not.[13] Heide, who had some business acumen and at least a basic knowledge of the wholesale auto business, justifiably relied on Debtor's representations regarding the Las Vegas deal, since no red flags were present and nearly all his prior dealings with Debtor had been fruitful. *Field v. Mans*, 516 U.S. 59, 70-71 (1995) (whether a creditor's reliance on a debtor's false representation is "justifiable" is a *subjective* question dependent upon the qualities and characteristics of the particular creditor and the circumstances of the particular case; the creditor's conduct need not conform to the standard of the reasonable man). Finally, in light of the other terms of the Las Vegas deal, neither the fact that Heide's checks were made out to Imports Plus, Inc. nor the fact that those checks were deposited in a corporate account is sufficient to

---

[12]We do not reach the issue of whether the bankruptcy court correctly found the $300,000 was an obligation owed by Debtor or the related issue of whether the bankruptcy court correctly concluded the corporate veil could and should be pierced if the $300,000 debt was instead owed by Imports Plus, Inc.

[13]Heide was adamant Debtor told him he had already purchased the vehicles at the time Heide issued the checks for $50,490; Debtor did not dispute Heide's testimony.

warrant the conclusion that the bankruptcy court erred in finding the Las Vegas deal was between Heide and Debtor, not Heide and Imports Plus, Inc.[14]

The record amply supports the bankruptcy court's conclusion that the $50,490 debt arising from the 2008 Las Vegas deal was a personal debt incurred by Debtor that should be excepted from discharge pursuant to § 523(a)(2)(A). Finding no clear error in that regard, we affirm the bankruptcy court's judgment to that extent.

CONCLUSION

The record does not support a finding that the $300,000 loan under the modified oral agreement was made in reliance on a fraudulent representation Debtor made concurrently with the creation of the debt. Thus, that portion of Heide's claim cannot be excepted from discharge under § 523(a)(2)(A), and we must reverse the bankruptcy court to that extent.

On the other hand, the record does support a finding that the Las Vegas deal was between Heide and Debtor individually and the further finding that Heide established each of the required elements under § 523(a)(2)(A) with respect to the

---

[14]The bankruptcy court did not find Heide had loaned money to Imports Plus, Inc. It instead found piercing the corporate veil was appropriate and necessary *if* such a veil existed. Having found the record was sufficient to support the bankruptcy court's finding that the $50,490 debt under the Las Vegas deal was incurred by Debtor personally, we do not reach the issue of whether the bankruptcy court correctly pierced the corporate veil as to that claim.

$50,490 he loaned Debtor pursuant to that agreement. Consequently, we affirm the bankruptcy court's determination of nondischargeability to the extent of that $50,490.

We remand the matter to the bankruptcy court for proceedings consistent with this opinion.

_____