

# In the Missouri Court of Appeals
# Eastern District

DIVISION ONE

| | | |
|---|---|---|
| STEVE HIBBS, | ) | No. ED100114 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of Jefferson County |
| vs. | ) | |
| | ) | Honorable Nathan Stewart |
| BRIAN BERGER, et al., | ) | |
| | ) | |
| Respondents. | ) | FILED: May 6, 2014 |

Steve Hibbs ("Plaintiff") appeals after summary judgment was entered against him, on Plaintiff's Petition against Brian Berger ("Berger") and Wood Nuts, Inc. ("Wood Nuts") (collectively, "Defendants"). Plaintiff's Petition requests the court to pierce the corporate veil, and declare a tortious interference with a business relationship, a civil conspiracy, and a breach of fiduciary duty in an attempt to establish the personal liability of Defendants for Tavern Creek Door Company, LLC's ("Tavern Creek") corporate debts. For the reasons explained herein, we affirm the trial court's grant of summary judgment in favor of Defendants.

## I.  BACKGROUND

This is an action by a creditor of Tavern Creek to pierce the corporate veil and establish personal liability on individuals and other business entities for Tavern Creek's

corporate debt. To alleviate confusion, we begin with a sketch of the individuals and business entities involved and then proceed to the facts giving rise to Plaintiff's Petition.

**A.** *The Individuals and Business Entities*

Tavern Creek is a limited liability company ("LLC"), organized by Thomas Taylor ("Taylor") in 1999 under the laws of the State of Missouri. For the entirety of this appeal, Tavern Creek was in the business of selling windows, doors, millwork, and other products of a similar type to contractors and individuals.

Wood Nuts is a holding corporation, incorporated in 1999 under the laws of the State of Missouri. At all relevant times herein, Wood Nuts was owned by Berger and Cheryl Barr (Berger's sister), and Berger was designated as the president.

Kirkwood Stair Company ("Kirkwood Stair")[1] is a corporation organized under the laws of the State of Missouri. At all relevant times herein, Berger was designated as the president of Kirkwood Stair.

Besides Berger being the president of both Kirkwood Stair and Wood Nuts, the three companies were involved in some business transactions or relationships: (1) Tavern Creek bought materials manufactured by Kirkwood Stair; and (2) as a holding company, Wood Nuts held interests in Kirkwood Stair, and, eventually, Tavern Creek.

**B.** *Tavern Creek's Business History*

From the date of organization until November 1, 2006, Taylor was Tavern Creek's sole member. Around January 2006, Plaintiff entered into a written employment agreement with Tavern Creek, outlining the duties and functions of Plaintiff's position as

---

[1] While Kirkwood Stair is not a defendant in the instant case, knowledge of Kirkwood Stair is required to understand the complex web of business transactions which occurred.

2

a salesperson. The employment agreement also included such things as Plaintiff's base salary, commissions, and other additional fringe benefits.

Due to the business relationship that developed between Kirkwood Stair and Tavern Creek, Taylor approached Berger to determine Berger's interest in investing in Tavern Creek. Eventually, on or about October 31, 2006, Taylor sold 50% of his interest in Tavern Creek to Wood Nuts, memorialized in a document titled Operating Agreement of Tavern Creek Door Company, LLC ("Tavern Creek Operating Agreement"). Wood Nuts purchased a 50% interest in Tavern Creek for $148,000. This purchase price was satisfied by Wood Nuts forgiving a $100,000 line of credit extended to Tavern Creek prior to this purchase, and, additionally, Wood Nuts extended a $52,000 loan to Tavern Creek, via a promissory note (which Taylor personally guaranteed), secured by a security agreement ("Security Agreement"). This Security Agreement granted Wood Nuts a security interest in all of Tavern Creek's personal property as detailed and defined within the Security Agreement.

As set forth within the Operating Agreement, both Wood Nuts and Taylor, individually, were bestowed 50% of the voting interest and 47.5% of the economic interest of Tavern Creek. Contemporaneously with Wood Nuts becoming a member of Tavern Creek, Plaintiff entered into a new employment agreement ("Employment Agreement") with Tavern Creek, wherein Plaintiff received a 5% economic interest as a non-voting member of Tavern Creek. Thus, as of November 1, 2006, Tavern Creek consisted of three members—Wood Nuts, Taylor, and Plaintiff—with the following interests:

3

| Tavern Creek Member | % of voting rights | % of economic interests |
|---|---|---|
| *Wood Nuts* | 50% | 47.5% |
| *Taylor* | 50% | 47.5% |
| *Plaintiff (Hibbs)* | 0% | 5% |

Additionally, per Tavern Creek's Operating Agreement, Tavern Creek was governed by a board of two managers. Both Wood Nuts and Taylor were afforded the right to each select one manager: Wood Nuts appointed Berger as a manager, and Taylor appointed himself as a manager. Each of Tavern Creek's managers was entitled to one vote on all voting matters.

Soon after Wood Nuts appointed Berger as a manager, Kirkwood Stair was contracted to undertake Tavern Creek's office functions (e.g., handling accounts receivable, client billing, collections, creating budgets, etc.) at a cost of $2000 per month.

By as early as 2007, Tavern Creek was experiencing financial difficulties. Throughout the next two years, in an apparent attempt to mitigate Tavern Creek's financial troubles, Wood Nuts made several other loans to Tavern Creek (totaling close to $300,000), via term notes or revolving loans, all of which were included in an amended Security Agreement (for all intents and purposes, this was the same Security Agreement as referenced, supra). The loans proved fruitless, and Tavern Creek defaulted on all the aforementioned notes and loans in 2009. As a result of Tavern Creek's defaults, Taylor and Wood Nuts foreclosed on Tavern Creek's assets.

Subsequently, Wood Nuts then exercised its rights under the Security Agreement. Tavern Creek voluntarily surrendered the collateral in which Wood Nuts had a security

4

interest under the Security Agreement. Although, Wood Nuts was owed substantially more money than the value of the surrendered collateral, Wood Nuts accepted the collateral as full satisfaction of all obligations of Tavern Creek and Taylor ("Settlement Agreement"). This all occurred prior to the Johnson County Judgment, infra, entered in Plaintiff's favor.

### C. Plaintiff's business relationship with Tavern Creek, Defendants, and Taylor

Plaintiff was employed by Tavern Creek from January 2006 until October 2008. As aforementioned, Plaintiff was a member of Tavern Creek commencing on November 1, 2006. Throughout the entirety of Plaintiff's employ with Tavern Creek, Plaintiff's salaries, car and phone allowances, and health insurance were fully satisfied. Additionally, Tavern Creek also fully paid Plaintiff for his commissions earned in 2006 (albeit, late) and partially paid Plaintiff for his commissions earned in 2007 (albeit, late again). Plaintiff was never compensated for the commissions allegedly earned by Plaintiff in 2008.

Plaintiff's Employment Agreement was terminated, in accordance with Tavern Creek's Operating Agreement, on August 29, 2008, and Plaintiff was hired as an at-will employee. Sometime thereafter, around October 2008, Plaintiff voluntarily terminated his at-will employment with Tavern Creek.

On September 17, 2008, Plaintiff filed a petition for damages in Johnson County, Kansas, against Tavern Creek, alleging breach of contract ("Johnson County Lawsuit"). The Johnson County Lawsuit resulted in a judgment for $166,273.24, against Tavern Creek and in favor of Plaintiff ("Johnson County Judgment"). Pertinently, the Johnson County Judgment was enabled by Tavern Creek's failure to respond to Plaintiff's

5

statement of uncontroverted facts incorporated in Plaintiff's motion for summary

judgment.[2]  The Johnson County Judgment, *inter alia*, determined:

> 7.  As set forth in plaintiff's statement of uncontroverted facts, all of which are deemed admitted pursuant to [Kansas] Supreme Court Rule 141(b), plaintiff should be awarded the following damages:
>
> > (a)  Interest on commissions that were due to plaintiff in 2006 but not fully paid until 2008; $1,798.26 + 237.96 (interest from 4/18/08-8/14/09) = $2,036.22
> >
> > (b)  Commissions due to Plaintiff in 2007 and 2008 that remain unpaid; $30,430.57 + $134.38 + $3,640.16 (interest from 4/18/08-8/14/09) = $34,205.11
> >
> > (c)  IRA matching contributions from 2006 that were made late; $202.50 + $24.12 (interest from 4/18/08-8/14/09) = $226.62
> >
> > (d)  IRA matching contributions from 2007 that have not been made; $2,412.92 + 287.37 (interest from 4/18/08-8/14/09) = $2,700.29
> >
> > (e)  Salary from October 13 through October 31, 2008 that remains unpaid; $2,596.14 + 183.72 (interest from 10/31/08-8/14/09) = $2,779.86
> >
> > (f)  5% of Tavern Creek's net profits from 2006; $11,912.38 + $2,808.06 (interest from 1/1/07-8/14/09) = $14,720.44
> >
> > (g)  Eight weeks of severance pay that remains unpaid; $6,923.04 + $438.71 (interest from 11/30/08-8/14/09) = $7,361.75
> >
> > (h)  Commissions from 2009[;] $44,325.14 + $2,808.88 (interest from 11/30/07-8/14/09) = $47,134.02
> >
> > (i)  Attorney's fees of $23,898.85; and
> >
> > (j)  Statutory penalties[:]  $121.44 x 257 days = $31,210.08

Thereafter, on January 19, 2010, Plaintiff filed a suit in the Circuit Court of

Jefferson County against Berger, Wood Nuts, and Thomas Taylor.[3]  Plaintiff's Petition

---

[2] At the time of the Johnson County Judgment, Tavern Creek lacked legal representation, and neither Wood Nuts nor Berger was made parties to the Johnson County Lawsuit.

6

pled four counts: piercing the corporate veil (Count I), interference with a business relationship (Count II),[4] civil conspiracy (Count III), and breach of fiduciary duty (Count IV). Defendants filed their motion for summary judgment. The trial court sustained Defendants' motion for summary judgment on all four Counts of Plaintiff's Petition. This appeal now follows.

Additional facts will be provided as needed during our analysis of the points presented by Plaintiff's appeal.

## II. DISCUSSION

Plaintiff contends, in five separate points on appeal, that the trial court erred in granting Defendants' motion for summary judgment. An introductory recitation of each point relied on is unnecessary as we discuss, in considerable detail, the particulars of each point throughout our analysis.

### *Standard of Review*

Appellate review of summary judgment is *de novo*, and we need not defer to the trial court's judgment. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). The criteria on appeal for testing the propriety of summary judgment are the same as the criteria applied by the trial court to test the propriety of summary judgment. Id. This Court reviews the record in the light most favorable to the party against whom summary judgment is entered and accords the non-movant "the benefit of all reasonable inferences from the record." Id. Summary judgment is appropriate where the moving party has demonstrated, on the basis of facts

---

[3] Taylor was dismissed from this lawsuit by Plaintiff on July 9, 2012, as a result of a settlement reached between Plaintiff and Taylor.

[4] Count II was directed solely at Berger.

7

as to which there is no genuine dispute, a right to judgment as a matter of law. Palmore v. City of Pacific, 393 S.W.3d 657, 662 (Mo. App. E.D. 2013); see also Rule 74.04(c)(6). "A 'genuine issue' that will prevent summary judgment exists where the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' is real, not merely argumentative, imaginary, or frivolous." Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. banc 2007); Frontenac Bank v. T.R. Hughes, Inc., 404 S.W.3d 272, 278 (Mo. App. E.D. 2012).

*Analysis*

**Points I & II—Piercing the Corporate Veil**

In his first two points on appeal, Plaintiff alleges the trial court erred in granting Defendants' motion for summary judgment on Count I of Plaintiff's Petition for veil piercing. In Point I, Plaintiff argues genuine issues of material fact remain regarding whether Defendants used their control of Tavern Creek to perpetrate fraudulent, dishonest, and illegal financial transactions to avoid satisfying payments allegedly owed to Plaintiff. Next, in Point II, Plaintiff challenges the trial court's legal finding that Plaintiff was prohibited from piercing Tavern Creek's corporate veil, in that Plaintiff, himself, was a member of said limited liability company. After a synopsis of the law regarding corporate veil piercing, we will address these Points in reverse order.

Ordinarily, business entities, such as limited liability companies, are regarded as wholly and separate legal entities, distinct from the members or owners who compose the business entities. Thomas Berkeley Consulting Eng'g, Inc. v. Zerman, 911 S.W.2d 692, 695 (Mo. App. E.D. 1995); see, e.g., Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 125 (Mo. banc 2010). Accordingly, shareholders of a corporation or

8

members of an LLC, generally, are not liable for the debts of their corporation or LLC. Jackson v. O'Dell, 851 S.W.2d 535, 537 (Mo. App. W.D. 1993) ("The corporation laws are designed to provide investors with protection from personal liability upon compliance with specific statutory provisions."). However, this protection (also known as "limited liability") that shareholders of a corporation and members of an LLC possess is not absolute. Mobius Mgmt. Sys., Inc. v. W. Physician Search, L.L.C., 175 S.W.3d 186, 188 (Mo. App. E.D. 2005). Occasionally, courts will disregard the business entity's identity, and permit creditors to 'pierce the corporate veil,' which means that shareholders of a corporation or members of the LLC must satisfy creditors' claims. Frank H. Easterbrook, Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89 (1985).

In order to disregard the existence of a corporate entity, in an attempt to hold a business entity's owners or members liable for a business entity's debts, Missouri law recognizes "narrow circumstances" wherein the "corporate veil" may be pierced. 66, Inc. v. Crestwood Commons Redevelopment Corp., 998 S.W.2d 32, 40 (Mo. banc 1999); see also Irwin v. Bertelsmeyer, 730 S.W.2d 302, 304 (Mo. App. E.D. 1987) ("Where a corporation is used for an improper purpose and to perpetrate injustice by which it avoids its legal obligations, equity will step in, pierce the corporate veil and grant appropriate relief.") (internal quotation marks and citations omitted). Courts will pierce the corporate veil or disregard the business entity once a plaintiff demonstrates a three-pronged test:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal

9

> > duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
> >
> > (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Collet v. Am. Nat'l Stores, Inc., 708 S.W.2d 273, 284 (Mo. App. E.D. 1986) (quoting Nat'l Bond Fin. Co. v. Gen. Motors Corp., 238 F. Supp. 248, 255 (W.D. Mo. 1964)); see also Edward D. Gevers Heating & Air Conditioning Co. v. Webbe Corp., 885 S.W.2d 771, 773-74 (Mo. App. E.D. 1994) ("To pierce the corporate veil, a plaintiff must meet a two-part test: first, the corporation must be controlled and influenced by persons or another corporation; second, evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud. . . . Implicit in this test for piercing the corporate veil is the requirement that the wrong done be the proximate cause of injury to third persons who dealt with the corporation.").[5] Therefore, courts will look through corporate organizations and to individuals when necessary to prevent injustice, but "doing so is the exception rather than the rule, and, ordinarily, a corporation will be regarded as a separate legal entity[.]" Love v. Ben Hicks Chevrolet, Inc., 655 S.W.2d 574, 576 (Mo. App. W.D. 1983).

### A. Can minority members of an LLC pierce the corporate veil (Point II)?

---

[5] Commentators have noted that "many very different terms are being used to describe the same doctrine of piercing the corporate veil." Norwood P. Beveridge, Piercing the Corporate Veil: The Oklahoma Law of Corporate Alter Egos, Adjuncts, and Instrumentalities, 26 Okla. City U. L. Rev. 503, 506 (2001). For instance, the doctrine has routinely been classified into five categories: (1) instrumentality cases, (2) alter-ego cases, (3) identity cases, (4) sham or shell cases, and (5) agency cases. Daniel G. Brown, Jurisdiction Over a Corporation on the Basis of the Contacts of an Affiliated Corporation: Do You Have to Pierce the Corporate Veil?, 61 U. Cin. L. Rev. 595, 599 (1992); see, e.g., Schlingman v. Reed, 750 S.W.2d 501, 504 (Mo. App. W.D. 1988) (characterized as "alter-ego" and "instrumentality"); 66, Inc., 998 S.W.2d at 41-42 (characterized as "shell"). However, a review of Missouri cases reveals "[t]here is no reason to believe that these different terms are distinguishable from each other[,]" as the elements are essentially identical—the facts are that which differ—and the purpose of each is to advance justice. Piercing the Corporate Veil: The Oklahoma Law of Corporate Alter Egos, Adjuncts, and Instrumentalities, 26 Okla. City U. L. Rev. 503, 506.

Incorporated in the trial court's Findings of Fact, Conclusions of Law, and Judgment, wherein Defendants' motion for summary judgment was granted, the trial court determined that Plaintiff was prohibited from piercing Tavern Creek's corporate veil because Plaintiff, himself, was a member and owner of Tavern Creek:

8. Here, Plaintiff seeks to pierce Tavern Creek's corporate veil even though he is an owner and member of Tavern Creek. The Court does not agree that an owner of a company may pierce his or her company's corporate veil. If a third party brought a claim seeking to pierce Tavern Creek's corporate veil and hold Plaintiff personally liable for Tavern Creek's debts, Plaintiff would undoubtedly hide behind the veil to avoid liability. Missouri law does not allow Plaintiff to take the position that he may pierce the corporate veil when it suits him. "[S]hareholders of a corporation should not be able to choose when its form is disregarded and when it is not." A & E Enterprises, Inc. v. Clairsin, Inc., 169 S.W.3d 884, 887 (Mo. App. E.D. 2005) (citing City of Lake Ozark[ v. Campbell], 745 S.W.2d [799,] 801 (Mo. App. S.D. 1988)]); see also Hospital Products, Inc. v. Sterile Design, Inc., 734 F. Supp. 896, 906 (E.D. Mo. 1990) (same) and CJS Corporations § 20 ("Stockholders should not be able to choose when the corporate form may be disregarded and when it may not be, and hide behind the corporate veil, then discard it when it is no longer usable.").

On appeal, Plaintiff argues that it would be "unconscionable" to permit Defendants to "hide behind the corporate cloak of immunity simply because their victim happened to be a 5% non-voting member[.]" Thus, the issue on appeal is whether a member—specifically, a minority member—of an LLC may pierce the corporate veil and allow for liability to be imposed upon the majority shareholder(s) or other corporate insider(s) for the majority shareholders' alleged wrongdoing.

In the prototypical case involving piercing the corporate veil, "a creditor with a right to the assets of an undercapitalized corporation seeks to execute against the assets of the party who owns and controls the corporation." Michael Richardson, The Helter Skelter Application of the Reverse Piercing Doctrine, 79 U. Cin. L. Rev. 1605 (2011).

11

"If the owner has intentionally abused the corporate form to profit excessively and shield himself from loss while disregarding the possibility of harm to third parties, the theory holds that this creditor should collect from the owner as if he and the corporation were one." Id.

In support of their position, Defendants direct this Court's attention to the same authority relied upon by the trial court, supra, finding Plaintiff was prohibited from piercing the corporate veil because he was an owner and member of said limited liability company. See also Ben Hicks Chevrolet, Inc., 655 S.W.2d at 576 ("Concomitantly, persons who chose to incorporate may not evade the consequences of doing so merely to suit their individual convenience. The gamut of legal consequences which would flow from permitting stockholders to draw and close the corporate veil at their own whim and caprice literally defies even the most fertile imagination.") (internal citations omitted). Plaintiff's brief is wanting of any authority.

Turning first to the authority cited by the trial court (and duplicated by Defendants), we glean guidance, but not an answer. Absolutely none of the authority so relied on encapsulates the issue on appeal—the ability of a minority shareholder to pierce the corporate veil to hold liable majority shareholders. These cases simply hold, and we so affirm, that a shareholder may not use the corporate cloak as both a weapon and a shield whenever advantageous to the shareholder. Clairsin, Inc., 169 S.W.3d at 887. However, such a legal principle does not dispose of this case as it is yet to be determined who (Plaintiff or Defendants), if either, utilized or are attempting to utilize the corporate cloak unscrupulously.

12

This, being a case of first impression in Missouri, we turn, next, to other jurisdictions for guidance and instruction. In Schattner v. Girard, Inc., 668 F.2d 1366 (D.C. Cir. 1981), the plaintiff, a dentist and inventor, entered into a licensing agreement with the defendant-corporation, wherein the plaintiff received a ten percent share of the defendant-corporation's stock. Id. at 1367. After disagreements arose, plaintiff instituted and prevailed in arbitration against the defendant-corporation. Id. Thereafter, the plaintiff sought to confirm the arbitrator's award in federal district court, alleging several counts and requesting the court to pierce the corporate veil and hold the owners of the defendant-corporation individually liable for the arbitrator's award. Id. at 1367-68. In ruling on cross-motions for summary judgment, the trial court, *inter alia*, refused to pierce the corporate veil, finding that the plaintiff, "as a minority shareholder who contracted with full knowledge of [owner's] corporate organization and financing," was estopped to contend that plaintiff's co-shareholder was liable for the debts of the defendant-corporation. Id. at 1368.

On appeal, the United States Court of Appeals for the District of Columbia reversed the trial court's judgment, because imposing such strict barriers to lawsuits by minority shareholders was in disharmony with "the flexible nature of a court acting in equity." Id. at 1369. Thus, the appeals court rejected and opposed "the overly narrow standard applied by the district court because a rule that minority shareholders many not seek to hold dominant shareholders liable for corporate debts would trap unwary creditors *who might accept a few shares of stock as partial compensation for debt*." Id. at 1370 (emphasis added). According to the Schattner court, "[t]he better rule is that under

13

appropriate circumstances a party is not precluded from piercing the veil of a corporation even thought he is a minority shareholder." Id. at 1371.

Similarly, under Missouri law, piercing the corporate veil is a doctrine rooted in equity. Fairbanks v. Chambers, 665 S.W.2d 33, 39 (Mo. App. W.D. 1984); see also O'Dell, 851 S.W.2d at 537 ("Of course, there are times when corporate officers and directors have so greatly abused the corporation's legal existence that equity demands that that the corporate veil be pierced."). Thus, equity requires a court to determine the applicability of piercing the corporate veil upon the particular facts of each case. See 2 Close Corp and LLCs: Law and Practice § 8:18 (Rev. 3d ed.). Therefore, because piercing the corporate veil is one of equity, we, too, oppose and reject the trial court's conclusion that, *per se*, minority shareholders may not pierce their own corporate veil. Rather, we agree with the Schattner court and hold that under "appropriate circumstances" a minority shareholder may attempt to pierce the corporate veil and impose the corporate obligation upon another shareholder. Schattner, 668 F.2d at 1371. After all, if majority shareholders desire to be protected via the equitable doctrine of corporate veil piercing, then we should also require majority shareholders to operate under the same equitable principles by which they seek protection. Stephenson v. Stephenson, 171 S.W.2d 565, 569 (Mo. 1943) ("The enforcement of the principle of equity—he who seeks equity *must do equity* . . . .") (emphasis added).

Moreover, besides equity, fairness to minority shareholders requires a bar on a *per se* rule that minority shareholders cannot pierce their own corporate veil. With increasing frequency, a number of jurisdictions have encountered and employed an alternate form of corporate veil piercing, commonly referred to a "reverse piercing." Gregory S. Crespi,

14

The Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J. Corp. L. 33, 36 (1990). "In a reverse pierce claim, either a corporate insider or a person with a claim against a corporate insider is attempting to have the insider and the corporate entity treated as a single person for some purpose." Id.; See, e.g., In re Xyan.Com, Inc., 299 B.R. 357, 364 (Bankr. E.D. Pa. 2003) ("In a reverse piercing case the assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same.").

Generally, reverse piercing claims manifest themselves in two varieties: (1) outside and (2) inside. "Outside reverse veil piercing" (or sometimes referred as "third party reverse piercing") "extends the traditional veil-piercing doctrine to permit a third-party creditor to pierce the veil to satisfy the debts of an *individual* [shareholder] out of the corporation's assets." Acree v. McMahan, 585 S.E.2d 873, 874 (Ga. 2003) (emphasis in original) (internal quotation marks and citations omitted); see also The Helter Skelter Application of the Reverse Piercing Doctrine, 79 U. Cin. L. Rev. at 1605 ("'Outsider' reverse piercing occurs when a party with a claim against an individual or corporation attempts to be repaid with assets of a corporation owned or substantially controlled by the defendant."). "Inside reverse veil piercing" involves a "*controlling insider* who attempts to have the corporate entity disregarded to avail the insider of corporate claims against third parties, or to protect corporate assets from third party claims that are available only for assets owned by the insider. . . . Inside reverse piercing claims allow a shareholder to disregard the corporate form of which he or she is a part." In re Phillips, 139 P.3d 639, 644-45 (Colo. 2006) (emphasis added) (internal quotation marks omitted). While this Court offers no guidance on the availability or acceptance of reverse veil piercing in

15

Missouri,[6] if the trend in other jurisdictions is to permit *majority shareholders* to pierce the corporate veil for their benefit in appropriate circumstances, then so, too, should minority shareholders be granted the authority to pierce the corporate veil in "appropriate circumstances."

Therefore, we grant Plaintiff's Point II; however, our analysis does not cease. In finding Plaintiff has the authority to pierce the corporate veil under "appropriate circumstances," this Court must continue on to the specific facts of the case to determine if such "appropriate circumstances" exist, similar to a typical piercing the corporate veil case. See, e.g., Bond v. Bond, 161 S.W.3d 859, 860 (Mo. App. W.D. 2005) ("Missouri law recognizes, *under certain circumstances*, that the corporate veil may be pierced to hold the owners of a corporation responsible for a liability or injury to another.") (emphasis added). This leads us back to Plaintiff's Point I.

**B.  Do genuine issues of material fact remain so to pierce Tavern Creek's corporate veil (Point I)?**

In his first point on appeal, Plaintiff argues that he proffered sufficient evidence to defeat Defendants' motion for summary judgment, in that genuine issues of material fact remain as to whether Defendants and Taylor used their alleged domination of Tavern Creek to commit fraud, violate a legal duty, or to commit a dishonest act in contravention of Plaintiff's legal rights. Specifically, Plaintiff avers that genuine issues of material fact still remain regarding:  (1) whether Defendants and Taylor completely dominated Tavern Creek; (2) whether Defendants and Taylor used their purported complete domination of Tavern Creek for an improper purpose and to perpetrate injustice by which it avoided its legal obligations owed to Plaintiff; and (3) whether Defendants' and Taylor's alleged

---

[6] The facts of this case do not call for this Court to extend the doctrine of veil piercing to reverse veil piercing.

16

improper conduct caused Plaintiff's injury. Collet, supra. We proceed directly to the second element of the doctrine of corporate veil piercing—breach of duty (i.e., improper purpose)—because we find it to be dispositive. Mobius Mgmt. Sys., Inc., 175 S.W.3d at 189 (all three elements must be present to pierce the corporate veil).

Essentially, Plaintiff claims that Defendants and Taylor used their alleged complete domination of Tavern Creek to execute the following improper or illegal acts: (1) Defendants transferred money to themselves via repayment of loans and salary increases, forgoing payment of commissions allegedly due to Plaintiff; (2) Defendants secretly amended Tavern Creek's Operating Agreement to permit the fraudulent transfer of assets; and (3) Defendants fraudulently transferred assets resulting in Tavern Creek's undercapitalization. Sansone v. Moseley, 912 S.W.2d 666, 669 (Mo. App. W.D. 1995) ("A court may pierce the corporate veil or disregard the separate corporate entity if the separateness is used as a subterfuge to defraud a creditor."); Haynes v. Edgerson, 240 S.W.3d 189, 197 (Mo. App. W.D. 2007) ("The fraud or violation of a legal duty can be met by showing that the company is undercapitalized."). Thus, Plaintiff argues these acts caused Tavern Creek to become undercapitalized and Defendants' transactions were fraudulent and illegal, meant to strip Tavern Creek of assets to avoid creditors, such as Plaintiff (specifically, the Johnson County Judgment against Tavern Creek and in favor of Plaintiff for $166,273.44).

It can be deduced that Tavern Creek—a windows, doors, and millworks merchant—encountered financial troubles in the years leading up to and through the housing crisis: Wood Nuts, in fact, made several large loans (totaling almost $300,000), all secured by the Security Agreement granting Wood Nuts interests in all of Tavern

17

Creek's personal property. Additionally, it can also be deduced that Tavern Creek had more liabilities than revenue by 2007. Finally, it can be deduced that Tavern Creek's Operating Agreement was amended in June 2008. However, while these actions caused Plaintiff repercussions and financial strife (in addition to Wood Nuts, who suffered a $200,000 loss), we are unable to see how these actions establish an improper purpose. See C. C. Dillon Co. v. Robinson, 636 S.W.2d 380, 383 (Mo. App. E.D. 1982). In essence, Plaintiff complains that he was not paid that which was owed to him, while other creditors (i.e., Wood Nuts) were paid. However, Plaintiff directs this Court to no genuine issue of material fact, and independent review of the entire record finds none, evidencing an unjust execution or improper purpose regarding the aforementioned transactions.

First, while Berger testified that he was not content with size or value of Plaintiff's salary and commissions, Tavern Creek, nevertheless, fully satisfied Plaintiff's salaries, car and phone allowances, and health insurance throughout Plaintiff's entire employment; Tavern Creek also fully paid Plaintiff for his commissions earned in 2006 (albeit, late) and partially paid Plaintiff for his commissions earned in 2007 (albeit, late again). Plaintiff was never compensated for the commissions allegedly earned by Plaintiff in 2008. If injustice or improper purpose was the scheme concocted by Defendants to siphon Tavern Creek's assets in order for Wood Nuts and Berger to recoup their losses, we fail to understand why Wood Nuts would continue to loan Tavern Creek money or why Plaintiff continued to receive payments—if Defendants' scheme was to defraud Plaintiff, they were, indeed, lousy schemers. Rather, this seems to be a prime example of the hardships businesses encountered during the lead up to the Great Recession (especially the construction and remodeling industries, in which Tavern Creek was

18

involved). There is no evidence of Defendants perpetrating injustice; rather, there is only evidence of poor business decisions—performed in good faith—in a struggling economy.

Second, while Tavern Creek's Operating Agreement was amended in 2008, there is not a scintilla of evidence this was effectuated in "secret" or to perpetrate fraud. Although the amendment to the Operating Agreement may not have benefited Plaintiff, it is evident that Defendants amended the Operating Agreement (in accordance with their voting rights and the amendment process originally agreed to by Plaintiff), in good faith, in hopes of shoring up the financial straits of Tavern Creek. Unfortunately, these amendments proved fruitless and Tavern Creek still sank under poor management. Furthermore, lest we forget, it was Plaintiff who bargained for only a 5% economic interest in Tavern Creek, instead of some alternative arrangement (i.e., voting rights, larger salary for no economic interest, etc.). Plaintiff thought a 5% economic interest to be advantageous—this proved incorrect. However, Plaintiff cannot pierce the corporate veil or complain of inequitable circumstances merely because he made a faulty business decision.

Third, while Wood Nuts secured the collateral of Tavern Creek before any other creditor (including Plaintiff), this was due to the security interest executed via the Security Agreement. Wood Nuts had a valid security interest in Tavern Creek's assets; Plaintiff did not. Plaintiff attempts to persuade this Court that receiving late commission payments or no commission payments at all, Plaintiff, in effect, "loaned" Tavern Creek money. Even if we assumed this to be correct, Plaintiff failed to bargain for or request a security interest. Plaintiff, being the businessman he purports to be, could have requested a security interest or sought judicial relief at the time his commissions came due and were

19

unpaid (or left Tavern Creek, as Tavern Creek's misfortunes were already unmistakable). Wood Nuts was first in line for payment due to its security interest. Plaintiff, and all other creditors, came next as unsecured creditors. There being no money or assets left after Wood Nuts exercised its security interest, Plaintiff, is unfortunately out of luck (and, so is Wood Nuts for a great chunk of its investment in Tavern Creek). This Court cannot pierce the corporate veil of Tavern Creek merely because Plaintiff made shoddy business decisions.

While we agree that Tavern Creek had financial difficulties, and even may have been more poorly managed, Plaintiff proffers no genuine issues of material fact that Tavern Creek was undercapitalized, that Defendants perpetrated fraud to hide assets, or that Defendants used their limited liability for improper purposes. This is not enough to warrant piercing the corporate veil. See Ben Hicks Chevrolet, Inc., 655 S.W.2d at 576 (piercing the corporate veil is the exception, not the rule).

Point I is denied and Point II is, thereby, rendered moot.

**Point V—Breach of Fiduciary Duty**

In his fifth point on appeal, Plaintiff contends the trial court erred in sustaining Defendants' motion for summary judgment on Plaintiff's cause of action for breach of fiduciary duty (Count IV of Plaintiff's Petition).

"When breach of fiduciary duty is asserted as a tort claim, as here, the proponent must [1] establish that a fiduciary duty existed between it and the defending party, [2] that the defending party breached the duty, and [3] that the breach caused the proponent to suffer harm." Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 381 (Mo. App.

20

E.D. 2000).  Finding element one dispositive, we address that element and elect to proceed no further.

### *No Fiduciary Duties Existed*

The existence of a fiduciary duty is a question of law, while the breach of that duty is for the trier of fact.  W. Blue Print Co., LLC v. Roberts, 367 S.W.3d 7, 15 (Mo. banc 2012).  "A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former."  Birkenmeier v. Keller Biomedical, LLC, 312 S.W.3d 380, 391 (Mo. App. E.D. 2010).  In determining whether a fiduciary relationship existed, the ultimate question is "whether or not trust is reposed with respect to property or business affairs of the other."  Id.  However, a fiduciary duty may not be created unilaterally; rather, a fiduciary duty "derives from the conduct or undertaking of the purported fiduciary duty which is recognized by the law as justifying such reliance."  Pool v. Farm Bureau Town & Country Ins. Co. of Mo., 311 S.W.3d 895, 907 (Mo. App. S.D. 2010).

Here, Plaintiff argues that a fiduciary relationship existed, and Defendants (both Berger and Wood Nuts) owed Plaintiff fiduciary duties as a matter of law by virtue of their relationships in the limited liability company of Tavern Creek—member-member (Plaintiff and Wood Nuts), and manager-member (Plaintiff and Berger).[7]  While the

---

[7] For purposes of clarification and emphasis, we restate the fact that Berger was not a member of Tavern Creek; Berger was merely a manager of Tavern Creek.  In light of this fact, a fiduciary duty could not have existed premised upon Plaintiff's designation as a member of Tavern Creek and Berger's designation as a member of Tavern Creek, because these were not the facts.  Birkenmeier, 312 S.W.3d at 391 (finding a member of an LLC does not owe a fiduciary duty to a non-member of the same LLC).  Nevertheless, the question remains and is discussed, infra, as to whether the correct designation and relationship between

21

fiduciary duties and obligations of those individuals who govern, control and own corporations and partnerships has been previously litigated and expounded,[8] this Court acknowledges that we are venturing into uncharted waters: the critical issues are what, if any, fiduciary duties are established by virtue of the creation of a limited liability company, and to whom do members and managers of limited liability companies owe a fiduciary duty. Debra Hatter & Rikiya Thomas, Swimming in Unsettled Waters: Fiduciary Duties and Limited Liability Companies, 49-AUG Hous. Law. 22, 23 (2011) ("The reason for the unsettled law seems to stem from the relatively new existence of limited liability companies as business entities.").

As background, we begin with a discussion of limited liability companies—a hybrid business entity having attributes of both a corporation and a partnership. Patmon v. Hobbs, 280 S.W.3d 589, 593 (Ky. App. 2009). "A limited liability company is a creature of statute and its corresponding rights and obligations are derived from statute." Pitman Place Dev., LLC v. Howard Inv., LLC, 330 S.W.3d 519, 530 (Mo. App. E.D. 2010). Those individuals or entities that hold an ownership interest in a limited liability company are designated as "members." Renaissance Leasing, LLC, 322 S.W.3d at 118 n.2. "Managers," on the other hand, are those individuals who may or may not be members of the LLC, but manage the LLC's operations. See Section 347.015; see also

Plaintiff (member of Tavern Creek) and Berger (manager of Tavern Creek) created a relationship sufficient to establish a fiduciary duty owed by Berger to Plaintiff.

[8] Under Missouri law, it is recognized that majority shareholders of a corporation owe a fiduciary duty to minority shareholders. Peterson v. Cont'l Boiler Works, Inc., 783 S.W.2d 896, 904 (Mo. banc 1990); see also Fix v. Fix Material Co., Ins., 538 S.W.2d 351, 358 (Mo. App. 1976) ("Shareholders in control are under a fiduciary duty to refrain from using their control to obtain a profit for themselves at the injury or expense of the minority, or to produce corporate action of any type that is designed to operate unfairly to the minority. . . . Though controlling shareholders are not fiduciaries in the strict sense, the general concepts of fiduciary law are useful in measuring conduct by those in control. . . ."); Forinash v. Daugherty, 697 S.W.2d 294, 301 (Mo. App. S.D. 1985) ("As a matter of general law, it may be said that the officers and directors of a corporation owe fiduciary duties to their corporation and to the other shareholders. These fiduciary duties possibly extend to controlling shareholders."); Zakibe, 28 S.W.3d at 382.

Section 347.186 (an LLC can be member-managed or manager-managed); see Unif. Ltd. Liability Co. Act § 102(10), (12), with reference to § 407(a) (2006) (defining "member-managed" and "manager-managed"). Generally, the rights, duties, and obligations of members and managers of an LLC spring from Missouri statutes (specifically the Limited Liability Company Act, Section 347.010, *et seq.*), in conjunction with the LLC's operating agreement and articles of organization. See Section 347.015; see also Urban Hotel Dev. Co., Inc. v. President Dev. Grp., L.C., 535 F.3d 874, 878 (8th Cir. 2008) (interpreting Missouri law).

In the instant case, we confront a manager-managed LLC as set forth in Tavern Creek's Operating Agreement; Tavern Creek was managed by a member (Taylor) and a non-member (Berger). Our inquiry relates to whether Berger, as a non-member manager, owes fiduciary duties to members of Tavern Creek (specifically, Plaintiff), and whether Wood Nuts, as a member, owes fiduciary duties to other members of Tavern Creek.

## A. Berger: Non-member and manager of Tavern Creek

The starting point for determining the liability of managers and members of an LLC is outlined in Missouri's Limited Liability Company Act:

> 1. Except as otherwise provided in the operating agreement an authorized person[9] shall discharge his or her duty under sections 347.010 to 347.187 and the operating agreement in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in the manner a reasonable person would believe to be in the best interest of the limited liability company, and shall not be liable for any such action so taken or any failure to take such action, if he or she performs such duties in compliance with this subsection.

---

[9] "Authorized person" is defined as a "manager, or member, if management of the limited liability company is vested in the members." Section 347.015(2). Here, management of Tavern Creek was vested in managers. Thus, for purposes of this case, managers, such as Berger, were considered "authorized persons."

23

2.  To the extent that, at law or equity, a member or manager or other person has duties, including fiduciary duties, and liabilities relating to those duties to the limited liability company or to another member, manager, or other person that is party to or otherwise bound by an operating agreement:

> (1) Any such member, manager, or other person acting under the operating agreement shall not be liable to the limited liability company or to any such other member, manager, or other person for the member's, manager's, or other person's good faith reliance on the provisions of the operating agreement; and

> (2) The member's, manager's or other person's duties and liabilities may be expanded or restricted by provision in the operating agreement.

3.  Except as otherwise provided in the operating agreement, every member or manager, if any, shall account to the limited liability company and hold as trustee for it any profit or benefit derived by such person without the informed consent of more than one-half by number of disinterested managers or members from any transaction connected with the conduct of the business and affairs or the winding up of the limited liability company, or from any personal use by such person of the property of the limited liability company, including confidential or proprietary information of the limited liability company or other matters entrusted to him as a result of his status as manager or member.

4.  Except as provided in subsection 2 of this section or the operating agreement, one who is a member of a limited liability company in which management is vested in one or more managers and who is not a manager shall have no duties to the limited liability company or to the other members solely by reason of acting in his capacity as a member.

Section 347.088.

The plain language of the statute, validated by Missouri precedent, evidences that managers (member or non-member managers) and members of an LLC owe fiduciary duties to the LLC, itself.  Section 347.088.2; W. Blue Print Co., LLC v. Roberts, 2011 WL 1597954, *10 (Mo. App. W.D. Apr. 29, 2011) ("It is true that members and managers of a limited liability company owe a *statutory* duty to the company.") (emphasis in original); see also Sutherland v. Sutherland,

24

348 S.W.3d 84, 91-92 (Mo. App. W.D. 2011) ("while certainly a manager has a duty to act in good faith and in the best interests of the limited liability company").

What remains unsettled is whether managers of an LLC owe fiduciary duties to members of the LLC. The plain language of the statute explicitly states that managers and members must discharge their duties "in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in the manner a reasonable person would believe to be in the best interest of the limited liability company . . . ." Section 347.088.1. Several jurisdictions, interpreting similar statutes, have determined this statutory language establishes that "[m]embers and managers of a limited liability company generally owe a fiduciary duty to other members." Zanker Grp., LLC v. Summerville at Litchfield Hills, LLC, 2005 WL 3047268, *3 (Conn. Super. Oct. 24, 2005) (interpreting Conn. Gen. Stat. § 34-141(a)); Out of Box Promotions, LLC v. Koschitzki, 55 A.D.3d 575, 578 (N.Y. App. Div. 2008) (interpreting N.Y. Ltd. Liab. Co. Law § 409[a]); Feeley v. NHAOCG, 62 A.3d 649, 660 (Del. Ch. 2012) (interpreting Del. Code tit. 6, § 18-1101(c), (e)). On the contrary, there exist those jurisdictions which prohibit LLC members from bringing a breach of fiduciary duty claim against an LLC manager. See, e.g., Gaunce v. Wertz, 2009 WL 803843, *2 (W.D. Ky. 2009) (interpreting Ky. Rev. Stat. Ann § 275.170). A review of these cases, the statutes which they interpret, and commentary on this subject reveal Missouri's Limited Liability Company Act is most analogous to

25

those jurisdictions that impose fiduciary duties upon managers to members of the LLC.

Furthermore, the imposition of fiduciary duties upon managers of an LLC to members of the LLC is in accord with the language of subsection 1 of Section 347.088 and with the rules of equity. See Section 347.088.1 (". . . with the care a *corporate officer of like position* would exercise under similar circumstances . . . .") (emphasis added); Section 347.177.5 ("In any case not provided for in sections 347.010 to 347.187, the rules of law and equity shall govern."). As discussed, supra, directors of a corporation stand in a fiduciary relationship to the corporation and its shareholders. Forinash, 697 S.W.2d at 302. Thus, logically and in accord with the rules and law of equity, the statute clearly envisioned imposing the same duties upon managers of an LLC as those duties imposed upon directors of a corporation. See 2 Close Corp and LLCs: Law and Practice § 9:47 (Rev. 3d ed.) ("Thus, fiduciary duty has a strong tradition in both the core sources of LLC law . . . ."). Therefore, we find that managers (member or nonmember managers), owe members of the LLC fiduciary duties, as a matter of law by virtue of the manager and member relationship.

However, our analysis does not end there. Unlike corporations and partnerships, Missouri's Limited Liability Company Act grants limited liability companies the power to effectively limit or define the scope of the fiduciary duties imposed upon an LLC's members and managers. See Section 347.088.2(2) ("The member's, manager's or other person's duties and liabilities may be

26

expanded or restricted by provision in the operating agreement.").  We turn now to Tavern Creek's Operating Agreement.

Pursuant to Tavern Creek's Operating Agreement, liability upon the members and managers of Tavern Creek was significantly curtailed:

3.6     Loans From Members.

\*\*\*

(b)  A member or any affiliate of a Member who makes a loan to the Company shall have no fiduciary duty or other duty to not declare a default or event of default or to not initiate any collection or enforcement actions or proceedings by it as a lender upon the occurrence of a default by the Company (even if such default by the Company could have been avoided or cured by an additional Capital Contribution or loan by such Member or an affiliate of the Member[)].

\*\*\*

7.1     Limitation of Liability.  To the extent permitted by law, a Member or Manager and their designated representatives, officers, directors, partners, trustees, members, employees and agents (each a "*Covered Person*") shall not be liable for damages or otherwise to the Company or any Member for any act, omissions, or error in judgment performed, omitted, or made by it or them in good faith and in a manner reasonably believed by it or them to be within the scope of authority granted to it or them by this [Operating] Agreement and in the best interests of the Company, provided that such act, omission or error in judgment does not constitute bad faith, fraud, gross negligence, willful misconduct or breach of fiduciary duty.

First, clearly, Section 3.6 of Tavern Creek's Operating Agreement shields both managers and members from liability regarding loans.  Thus, Berger, as a manager of Tavern Creek owed no fiduciary duty to Plaintiff regarding the foreclosure of Tavern Creek's assets.

Second, with respect to the other acts or omissions allegedly performed by Berger and complained of by Plaintiff (i.e., failure to pay Plaintiff commissions and interests, and allegedly amending Tavern Creek's Operating Agreement in secret), Section 7.1 of

27

Tavern Creek's Operating Agreement limits the fiduciary duties of managers and members operating in good faith and in a manner reasonably believed to be within the scope of the Operating Agreement. Here, the evidence demonstrates that Berger operated, in good faith, under color of authority reasonably believed to spring from Tavern Creek's Operating Agreement; nothing proffered by Plaintiff demonstrates Berger operated in bad faith or fraudulently. See, e.g., In re Tri-River Trading, LLC, 329 B.R. 252, 268 (B.A.P. 8th Cir. 2005) (affirmed sub nom. DeBold v. Case, 452 F.3d 756, 762 (8th Cir. 2006) (interpreting Missouri law)).[10]

Therefore, while, statutorily, Berger owed Plaintiff fiduciary duties, Berger's fiduciaries were abridged by Tavern Creek's Operating Agreement, in accordance with the statutory rights to do so. Thus, Berger did not owe Plaintiff fiduciary duties.

## B. Wood Nuts: Member and Non-manager of Tavern Creek

Next, we turn to the issue of whether Wood Nuts, as a member and non-manager, owed Plaintiff fiduciary duties.

Under the Missouri Limited Liability Company Act, "one who is a member of a limited liability company in which management is vested in one or more managers and who is not a manager shall have no duties to the limited liability company or to the other members solely by reason of acting in his capacity as a member." Section 347.088.4. Accordingly, Wood Nuts owed no fiduciary duties because: (1) Tavern Creek was a manager-managed LLC; (2) management of Tavern Creek was invested in one or more

---

[10] Defendants argue, that assuming, *arguendo*, Berger or Wood Nuts owed Plaintiff fiduciary duties, Plaintiff should be prohibited from maintaining his claim for Breach of Fiduciary Duty because such action must be brought as a derivative action. Bruner v. Workman Oil Co., 78 S.W.3d 801, 804 (Mo. App. S.D. 2002) ("An individual shareholder does not have standing to maintain a personal action for recovery of corporate funds."). Because we find no fiduciary duties existed, we need to reach this argument; however, it is worth noting that Defendants' proposition may no longer stand on sound legal ground in the context of limited liability companies. See, e.g., James R. Burkhard, LLC Member and Limited Partner Breach of Fiduciary Duty Claims: Direct or Derivative Actions?, 7 J. Small & Emerging Bus. L. 19, 35 (2003).

managers (i.e., Berger and Taylor); and (3) Wood Nuts was not a manager, but only a member of Tavern Creek. Id.

Some jurisdictions have found that controlling members of LLCs owe fiduciary duties to minority members. For example, some jurisdictions impose fiduciary duties upon controlling members who are also non-managers of an LLC. See, e.g., Kelly v. Blum, 2010 WL 629850, *12-*13 (Del. Ch. Feb. 24, 2010); In re S. Canaan Cellular Inv., LLC, 2010 WL 3306907, *7 (E.D. Penn. Aug. 10, 2010). However, because this argument was not raised by Plaintiff—either to the trial court or to this Court on appeal— we elect not to address it and withhold judgment until the facts of a case and preservation of claims so present themselves. Therefore, as a matter of law, fiduciary duties did not exist, and Wood Nuts did not owe Plaintiff any fiduciary duty.

Finding neither Berger nor Wood Nuts owed Plaintiff fiduciary duties, Point V is denied.

**Point III—Interference with a Business Relationship**

Next, Plaintiff's third point advances multiple reasons why the trial court erred in granting Defendants' motion for summary judgment as to Count II of Plaintiff's Petition which pled a cause of action for tortious interference with a business relationship. We note that this cause of action, pursuant to Count II of Plaintiff's Petition was directed at only Berger.

"The relationship protected by the tort of interference with a business relationship can take several forms including, most obviously, a contractual one." Clinch v. Heartland Health, 187 S.W.3d 10, 14 (Mo. App. W.D. 2006). A plaintiff must satisfy five elements in a cause of action sounding in tortious interference with a business relationship: (1) the

plaintiff was involved in a valid business relationship; (2) the defendant was aware of that relationship; (3) the defendant intentionally interfered with that relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of the defendant's conduct. Id.; see also Nazeri v. Mo. Valley Coll., 860 S.W.2d 303, 316 (Mo. banc 1993). The plaintiff carries the burden of proof and is required to proffer substantial evidence supporting each and every element; if the plaintiff fails to establish substantial evidence of any one element, the plaintiff's claim for tortious interference fails. SSM Health Care, Inc. v. Deen, 890 S.W.2d 343, 346 (Mo. App. E.D. 1994).

Of the five elements aforementioned, the fourth—absence of justification—is primarily at issue. In a cause of action for tortious interference with a business relationship, Missouri is among those jurisdictions that require a plaintiff to prove that the defendant lacked justification for his or her conduct. Hamilton v. Spencer, 929 S.W.2d 762, 764-65 (Mo. App. W.D. 1996). "Absence of justification is the absence of any legal right to take the actions complained of. One may be justified in interfering with a contract if he has a legal right to do so." Meyer v. Enoch, 807 S.W.2d 156, 159 (Mo. App. E.D. 1991) (internal citations omitted); W. Blue Print Co., LLC, 367 S.W.3d at 20 ("A defendant cannot be held liable for interfering with a business relationship if he or she has an unqualified right to perform the act.").

Here, the trial court determined that Berger, as a manager (the equivalent of a corporate officer) of Tavern Creek, was privileged and had a legal right to breach Tavern Creek's employment contract with Plaintiff. Generally, a manager, acting within his or

30

her authority, has the authority and is privileged to induce a breach of a corporate contract. Enoch, 807 S.W.2d at 159. This is not challenged.

However, the privilege of a manager to induce a breach of a corporate contract is not absolute: the manager shall not employ improper means, the manager must act in good faith to protect the corporate interest, and the manager must not act out of self-interest. Preferred Physicians Mut. Mgmt. Grp. v. Preferred Physicians Mut. Risk Retention, 918 S.W.2d 805, 813 (Mo. App. W.D. 1996). For purposes of this tort, "improper means" are defined as "those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law." Acetylene Gas Co v. Oliver, 939 S.W.2d 404, 408 (Mo. App. E.D. 1996). This is challenged, and, thus, the issue before us is whether Plaintiff produced sufficient evidence to create a genuine issue of material fact as to whether Berger's actions lacked justification by use of "improper means."

Plaintiff argues that genuine issues of material fact remain regarding whether Berger used improper means to induce Tavern Creek's breach of Plaintiff's Employment Agreement, whether Berger acted out of self-interest, and whether Berger actually operated under the covenants of good faith and fair dealing. Plaintiff essentially claims that Berger improperly used his status as a manager to breach the contract, in that Berger was acting out of personal, rather than corporate, interests. In support of his claim, Plaintiff directs this Court's attention to Plaintiff's affidavit, Tavern Creek's Operating

31

Agreement, and slices of Berger's deposition testimony and the deposition testimony of Kirkwood Stair's corporate representative.[11]

First, as to Plaintiff's claim that Berger used improper means and acted solely to benefit his own interests, no facts were presented by the aforementioned evidence, and a review of the entire record reveals none, evidencing that Berger used improper means that constituted an independent wrongful act to induce Tavern Creek to terminate Plaintiff's Employment Agreement or that Berger acted for his own personal benefit. See Eggleston v. Phillips, 838 S.W.2d 80, 82-83 (Mo. App. E.D. 1992) (where a corporate officer is the defendant, absence of justification requires that the officer interfere with the contract for personal benefit, *plus* that the officer employed improper means; both, not one or the other, are required). Here, the evidence demonstrates—after a review of Berger's depositions in their entireties—the opposite (i.e., Berger acted out of corporate interests): Berger testified that Plaintiff's contract overcompensated him for the amount of business he brought to Tavern Creek; and as corporate representative of Kirkwood Stair, Berger testified that Plaintiff's receipt of commissions caused Tavern Creek to forgo repaying debts owed to *all* debtors, not just Kirkwood Stair. It is obviously in any corporation's best interests to hire the most qualified individuals and to compensate them relative to their talents, and to pay the corporation's debts in a timely manner. Such corporate interests do not equate to improper means. This evidence does not establish much more than Berger's concern with the financial stability of Tavern Creek—with which a manager should concern himself or herself. Merely because Berger did not act in the *best interest of Plaintiff* does not mean Berger employed improper means to induce

---

[11] Kirkwood Stair's personal corporate representative was Berger.

the breach of Plaintiff's contract with Tavern Creek. Beelman River Terminals, Inc. v. Mercantile Bank, N.A., 880 S.W.2d 903, 908 (Mo. App. E.D. 1994) ("Protecting one's economic interests constitutes justification for interference with a contract or business expectation unless one employs improper means to protect that interest."); Baldwin v. Prop., Inc. v. Sharp, 949 S.W.2d 952, 956 (Mo. App. W.D. 1997) ("Typically, the issue of justification arises in situations in which the defendant has a legitimate economic interest to protect. In these situations, the defendant is said to be justified in interfering with another's business expectancy for the purpose of protecting his own economic interest, so long as he does not employ improper means.").

Second, while it is true "Missouri law implies a covenant of good faith and fair dealing in every contract[,]" Plaintiff offers no evidence that Defendants did not so operate. Slone v. Purina Mills, Inc., 927 S.W.2d 358, 368 (Mo. App. W.D. 1996). Essentially, Plaintiff decries the amendments to Tavern Creek's Operating Agreement as unfair and illegal. However, Plaintiff's proffer of evidence is wanting of anything resembling illegal or unfair conduct on behalf of Defendants. Plaintiff seems to have forgotten that as a 5% economic shareholder, he had little control over the operations of Tavern Creek—something he agreed to in November 2006. If Plaintiff wanted more control, he should have bargained for more control. We find no evidence that Defendants operated in bad faith.

Therefore, the record contains no evidence creating a genuine issue of material fact on Plaintiff's claims of tortious interference. The trial court's summary judgment as to Count II of Plaintiff's Petition was proper.

Point III is denied.

33

**Point IV—Civil Conspiracy**

In his fourth point on appeal, Plaintiff contends that the trial court erred in sustaining Defendants' motion for summary judgment concerning Plaintiff's civil conspiracy claim (Count III of Plaintiff's Petition). Specifically, Plaintiff argues that genuine issues of material fact remain regarding whether Defendants and Taylor conspired to illegally withhold Plaintiff's commissions, in violation of Section 407.913.

"A civil conspiracy is an agreement between at least two persons to do an unlawful act, or to use unlawful means to do an act which is lawful." Blaine v. J.E. Jones Constr. Co., 841 S.W.2d 703, 713 (Mo. App. E.D. 1992). However, a civil conspiracy "does not give rise to a civil action unless something is done pursuant to which, absent the conspiracy, would create a right of action against one of the defendants, if sued alone." Gettings v. Farr, 41 S.W.3d 539, 541-42 (Mo. App. E.D. 2001) (citations omitted); see also Spencer, 929 S.W.2d at 767 ("Civil conspiracy is not itself actionable in the absence of an underlying wrongful act or tort."). "If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails as well." Envirotech, Inc. v. Thomas, 259 S.W.3d 577, 586 (Mo. App. E.D. 2008). Therefore, a case will be dismissed if a plaintiff fails to plead a cause of action for the underlying tort. Id. at 587.

At the trial court, Defendants' motion for summary judgment as to Count III of Plaintiff's Petition sounding in civil conspiracy was sustained upon two grounds: (1) Plaintiff could not prove the "two or more persons" element; and (2) Plaintiff could not meet the "unlawful objective" element. We elect to address only the "unlawful object" element regarding Plaintiff's claim for civil conspiracy as we find it to be dispositive.

34

The trial court sustained Defendants' motion for summary judgment as to Counts I (Piercing the Corporate Veil), II (Interference with a Business Relationship) and IV (Breach of Fiduciary Duty). We have analyzed and affirmed the trial court's judgment granting Defendants' summary judgment on those Counts. Thus, what results is the survival of no causes of action or underlying Counts in Plaintiff's Petition. Accordingly, Count III of Plaintiff's Petition, sounding in civil conspiracy, cannot lie independently of the underlying torts. Chmieleski v. City Prod. Corp., 660 S.W.2d 275, 286 (Mo. App. W.D. 1983) ("if no action on the case lies, no cause of action for conspiracy may be maintained").

On appeal, Plaintiff attempts to base his civil conspiracy claim on two new independent causes of action—breach of contract and failure to pay sales commission, pursuant to Section 407.913. See 11 Mo. Prac., Statutory Forms VAMS § 407.913 Form 1 (3d ed.). However, neither of these causes of action was pled in Plaintiff's Petition— the only reference made to Defendants' alleged violation of Section 407.913 can be found in Plaintiff's response to Defendants' motion for summary judgment. Thus, essentially, Plaintiff camouflages his claim for civil conspiracy upon new arguments or causes of actions that were not included in Plaintiff's Petition or before the trial court[12]. In Missouri, it is axiomatic that for an argument to be preserved for appellate review, it must first be raised in the trial court. State Farm Mut. Auto. Ins. Co. v. Esswein, 43 S.W.3d

---

[12] This Court acknowledges that Plaintiff's alleged cause of action for breach of contract was part and parcel of Plaintiff's Count II of his Petition sounding in interference with a business relationship. However, the cause of action for breach of contract was not independently pled, and "[i]n Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. banc 1996); see also Thomas, 259 S.W.3d at 587 ("A case will be dismissed if the plaintiff failed to plead a cause of action for the underlying tort."); see, e.g., Wigley v. Capital Bank of Sw. Mo., 887 S.W.2d 715, 722 n.5 (Mo. App. S.D. 1994) ("Conspiracy to breach was not a theory here claimed or submitted. Count IV was based upon conspiracy to tortiously interfere with the agreement.").

35

833, 839-40 (Mo. App. E.D. 2000).  These theories of alleged wrongful acts consummated by Defendants, which Plaintiff avers in support of Plaintiff's claim for civil conspiracy, have not been preserved for consideration by this Court.  Thus, Plaintiff has not alleged any underlying wrongful conduct upon which to rest his claim for civil conspiracy.

Point IV is hereby denied.

### III.  CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

_____
Roy L. Richter, Presiding Judge

Clifford H. Ahrens, J., concurs
Glenn A. Norton, J., concurs

36